Troy SWINTON, Plaintiff–Appellee,

v.

POTOMAC CORPORATION, dba Crescent Cardboard Company, dba Crescent/U.S. Mat, Defendant–Appellant.

No. 99–36147.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 9, 2001

Submission Withdrawn Resubmitted Oct. 24, 2001

Filed Oct. 24, 2001

Thomas Sullivan (argued), Jenner & Block, Chicago, Illinois, Richard R. Winter, Sarah E. Pace (on the brief), McBride Baker & Coles, Chicago, Illinois, for the defendant/appellant.

Jeffrey Needle, Law Office of Jeffrey Needle, Seattle, Washington, for the plaintiff/appellee.

Before: McKEOWN, W. FLETCHER, and RAWLINSON, Circuit Judges.

McKEOWN, Circuit Judge:

This case should serve as a reminder to employers of their obligation to keep their workplaces free of discriminatory harassment. Although much of what happened here was characterized as "jokes," neither the discrimination nor the jury verdict is a laughing matter. Troy Swinton, a worker in the shipping department of a cardboard company, was subject to repeated "jokes" by co-workers featuring use of the word "nigger" and to a continuing stream of racial slurs. He sued his former employer for racial harassment under federal and state anti-discrimination statutes, and a jury awarded him $5,612 in back pay, $30,000 for emotional distress, and $1,000,000 in punitive damages. The employer's claims on appeal fall into three categories. First, the employer asserts that the district court's failure to instruct the jury as to an affirmative defense under *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), as applied to a negligence theory of employer liability, warrants a new trial. Second, it alleges a variety of evidentiary and instructional errors. Finally, the employer argues that punitive damages were either unwarranted as a matter of law, or, in the alternative, constitutionally excessive under *BMW of N. Am. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). We affirm both the liability determination and the award of punitive damages.

## BACKGROUND

Troy Swinton was employed in the shipping department of U.S. Mat between August 1996 and February 1997. He was the only African–American of approximately 140 employees of the Woodinville, Washington company, which manufactures cardboard matting used in picture frames. Shortly before Swinton was hired, the company was acquired by the Chicago-based Potomac Corporation.

Swinton became aware of U.S. Mat through his fiancee, whose uncle, Jon Fosdick, worked there as supervisor in the bevel-cutting department. Swinton listed Fosdick as a reference on his job application. Fosdick would often stop by the shipping department. While there, he would regularly tell racially offensive jokes in the presence of Swinton and others. Among the "jokes":

● What do you call a transparent man in a ditch? A nigger with the shit kicked out of him.

● Why don't black people like aspirin? Because they're white, and they work.

● Did you ever see a black man on "The Jetsons"? Isn't it beautiful what the future looks like?

● Reference to "Pontiac" as an acronym for "Poor old nigger thinks it's a Cadillac."

According to Swinton, Fosdick began telling such jokes soon after he arrived at the company and continued "whenever he felt like it, all the time."

Pat Stewart, Swinton's immediate superior as supervisor of the shipping department, witnessed Fosdick telling racial jokes and laughed along. Swinton testified that Stewart "was present at the table most of the time when [Fosdick] was coming in and saying this [the racial jokes]." Stewart also acknowledged making "racial jokes or a slur" two or three times, though it is not clear from his testimony whether such conduct occurred in Swinton's presence. Stewart also overheard one of the two plant managers make racial jokes on several occasions. Stewart admitted that

although he had an obligation under company policy to report the racial harassment, he never made any such report and never told Fosdick or anybody else to stop making such jokes.

Though Fosdick was the main perpetrator of the jokes, Swinton's co-workers also told racially offensive jokes in his presence, and those comments were witnessed by several co-workers. The jokes and comments ranged from numerous references to Swinton as a "Zulu Warrior" to a comment in the food line, "They don't sell watermelons on that truck, you know, how about a 40–ouncer?" On the subject of Swinton's broken-down car, it was suggested "why don't you get behind it and push it and call it black power" and "why don't you just jack a car. You're all good at that."

Testimony by co-workers underscored the ubiquity of the racist atmosphere at U.S. Mat. One co-worker said that there were jokes about a wide variety of ethnic groups, including whites, Asians, Polish people, gays, Jews, and Hispanics. Another testified that the majority of the people at U.S. Mat had actually witnessed the use of racially offensive language, and a third employee testified that "just about everybody" at U.S. Mat had heard Fosdick use "racial slurs and comments."[1] During the short time he was at U.S. Mat, Swinton heard the term "nigger" more than fifty times.

Swinton's reactions to the racially derogatory comments included glaring and walking away, and remarking to co-workers that the jokes were "f* * *ed up." Swinton testified that he did not directly ask Fosdick to stop because he knew that Fosdick regularly carried a .22 caliber pistol in his back pocket.

Despite Fosdick's regular use of racially offensive language, Swinton and Fosdick socialized both at work and outside of work. Swinton claimed that he socialized with Fosdick not because he enjoyed doing so, but only at the urging of his fiancee (Fosdick's niece), to maintain harmonious family relations.

Swinton testified that he did not immediately quit in the face of the racial comments because he needed the job to support himself and his fiancee, who was pregnant. He eventually quit on February 27, 1997, stating in his testimony that he was "fed up ... with all the name-calling. I was angry. I was mad. I was upset. I was frustrated. I just couldn't take it no more. I had to get out of there." Potomac's theory explaining why Swinton quit and brought suit centers around an alleged breakdown in family relations. According to Potomac, Swinton brought suit as a means to retaliate against Fosdick because of comments that Fosdick's wife purportedly made about Swinton and his fiancee.

Upon commencing employment at U.S. Mat, Swinton was presented with an employee manual. Swinton testified alternately that he "read" and "browsed through" the manual; he did sign a form acknowledging that he received it. The employee manual included the following language:

> If you believe you are being harassed by co-workers or others, notify your Supervisor. If you believe you are being harassed by your Supervisor, or if this is otherwise inappropriate, notify the President. No employee will be retaliated against in any way for making a factually supported claim of harassment.

---

**1.** The trial transcript contains references to many other instances of offensive racial comments by various employees of U.S. Mat, but it is not clear whether any of these were directed at, or witnessed by, Swinton.

Swinton never availed himself of any formal internal complaint procedures. He advanced several reasons. According to Swinton, the "Supervisor" to whom he was supposed to direct his complaint was Pat Stewart, who had already witnessed the joke-telling and had actually "laugh[ed] along." Swinton claimed that he did not know the identity of the "President" (whom the manual identified as an alternative complaint recipient), and thus did not bring the harassment to his attention. Swinton also feared Fosdick, whom he knew to carry a gun. Swinton told a co-worker that he feared that he might lose his job if he complained because he was the "low man on the totem pole" (questioner's paraphrase). Finally, Swinton testified that "everyone already knew." This answer came in response to a question whether "people in management" knew of the racially offensive language directed at him.

On March 7, 1997, Swinton filed an application for unemployment benefits with the Washington Employment Security Department, indicating that he had quit on February 28. In his handwritten responses to questions on the application form, Swinton referred to "racial slander" and "racial jokes daily by numerous people," and stated, "Everyday, from one person or another, a racial joke or comment was thrown my way, and I was sick and tired of it." Swinton identified several of the specific jokes about which he and others later testified at trial. He noted that he "didn't feel comfortable going to management because they knew about the problem [and] did nothing about it."

The State of Washington notified U.S. Mat of Swinton's allegations of racial harassment on or about April 17, 1999. Upon learning of the charges, U.S. Mat Human Resources Manager Vickie Thompson interviewed Stewart, the plant co-managers, and the president. All denied to Thompson that they had witnessed the harassment of Swinton. Sometime in June, Thompson also interviewed Fosdick, who had left U.S. Mat's employ April 1. After Swinton filed suit in July 1997, Thompson interviewed more of Swinton's co-workers, who confirmed Fosdick's telling of racial jokes but stated that they believed that Swinton was not bothered by them and "would laugh and joke back." In September of 1997, in apparent response to Swinton's charges, U.S. Mat had all of its supervisors and managers undergo training for the identification and prevention of harassment. No one at U.S. Mat was disciplined for the use of, or toleration of, offensive racial language.

Swinton filed suit against Potomac in Washington state court, alleging causes of action under 42 U.S.C. § 1981,[2] R.C.W. 49.60 *et seq.* (the "Washington Law Against Discrimination"), and the state tort of "outrage" (intentional infliction of emotional distress). Potomac removed the action to federal court. Judge John Coughenour, who conducted pre-trial proceedings, denied Potomac's motion for summary judgment on the causes of action under the job discrimination statutes, but granted its motion as to the state "outrage" claim. The case was then transferred to Judge Jack Tanner for trial. After trial, the jury returned a verdict for Swinton and damages consisting of $5,612 in back pay, $30,000 for emotional distress, and $1,000,000 in punitive damages. Potomac moved for a new trial under Federal

**2.** "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts.... The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

Rules of Civil Procedure 50(b) and 59. The district court denied the motion with a brief order stating that the motion "merely rehashes arguments that it made and lost during trial."

## STANDARDS OF REVIEW

■■■■ "[T]he verdict must be affirmed if there is substantial evidence to support the verdict." *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir.1999). The evidence must be viewed in the light most favorable to the non-moving party (Swinton). *See Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1161 (9th Cir.1997). In evaluating jury instructions, "prejudicial error results when, 'looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered.'" *In re Asbestos Cases*, 847 F.2d 523, 524 (9th Cir.1988) (citing *Pollock v. Koehring Co.*, 540 F.2d 425, 426 (9th Cir.1976)). "This court reviews evidentiary rulings for abuse of discretion." *United States v. Fleming*, 215 F.3d 930, 938 (9th Cir.2000) (citation omitted). We review de novo a due process challenge to the punitive damages award. *Cooper Industries, Inc. v. Leatherman*, 532 U.S. 424, 121 S.Ct. 1678, 1683, 149 L.Ed.2d 674 (2001).

## DISCUSSION

### I. ELLERTH/FARAGHER DEFENSE

■■■■ We first address whether the affirmative defense to employer liability established in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), is available in a claim for harassment based on the employer's negligence. In those cases the Supreme Court set out the contours of an employer's affirmative defense to harassment perpetrated by a superior, available in certain circumstances. The Court held,

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [ ] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.... No affirmative defense is available however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Faragher*, 524 U.S. at 806, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257 (citation omitted) (the language in each case is identical). The defense is premised on the principle that an employer may escape liability for harassment by certain of its employees when it undertakes appropriate steps to remedy the situation. The defense also recognizes that a harassed employee bears some responsibility to avoid or mitigate workplace hostility. The question is whether such a defense is available under all of Swinton's claims: 1) vicarious liability; 2) harassment based on negligence (the defendant knew or should have known of the harassment; and 3) the state law claim. Potomac asserts that the district court erred by failing to incorporate the *Ellerth/Faragher* defense into the jury instruction on the negligence theory. But, as we explain, the court was not required to do so.

■■■■ A plaintiff may state a case for harassment against the employer under one of two theories: vicarious liability or negligence.[3] Which route leads to employer liability depends on the identity of the actual harasser, specifically whether he is a supervisor of the employee, or merely a co-worker. If the harasser is a supervisor, the employer may be held vicariously liable. *Nichols v. Azteca Restaurant Enters.*, 256 F.3d 864, 875 (9th Cir.2001); *Ellison v. Brady*, 924 F.2d 872, 876 (9th Cir.1991). If, however, the harasser is merely a co-worker, the plaintiff must prove that the employer was negligent, *i.e.* that the employer knew or should have known of the harassment but did not take adequate steps to address it. *Nichols*, 256 F.3d at 875. Even after the advent of the affirmative defense outlined in *Ellerth* and *Faragher*, the negligence standard "still applies to sexual harassment by coworkers." *Burrell v. Star Nursery*, 170 F.3d 951, 955 (9th Cir.1999).

Swinton's negligence theory was based primarily upon the harassment by Fosdick, who, while a supervisor within the company, was not *Swinton's* supervisor in the shipping department. The Supreme Court made clear that the affirmative defense outlined in *Ellerth* and *Faragher* applies only in cases of vicarious liability, where the harasser is the victim's supervisor. *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275 (stating that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the em-

ployee" and then proceeding to outline affirmative defense).

Potomac argues that the availability of the *Ellerth/Faragher* defense in the vicarious liability context, but not in the negligence context, "leads to an absurd result: that an employer is better off if the harasser is an immediate supervisor or someone with successively higher authority, because it triggers an obligation of the plaintiff to utilize internal remedies." This reasoning rests on the faulty premise that an employer is "better off" in the strict liability context than in the negligence context.

It is, in fact, slightly misleading to say that the *Ellerth/Faragher* defense is not available in the negligence context. While it is strictly true that it is not available as an affirmative defense, the principle embodied in the defense—that an employer can avoid liability in situations where it acts promptly to remedy harassment—is contained in the requirements for a prima facie case based on negligence. In the context of this case, it was Swinton's burden, in accord with Jury Instruction 10, to prove that management knew or should have known of the harassment and "failed to take reasonably prompt, corrective action ...". And, as the Second Circuit has explained, a plaintiff alleging co-worker harassment must prove that the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 249 (2d Cir.1995) (cited in the post-*Ellerth/Faragher* case *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir.

---

**3.** Though *Ellerth* and *Faragher* involve Title VII, their reasoning applies to cases involving § 1981 and RCW 49.60 *et seq. See Jurado v. Eleven–Fifty Corp.*, 813 F.2d 1406, 1412 (9th Cir.1987) ("An employee may seek relief under both Title VII and section 1981 for racial discrimination in employment. *Lowe [v. City of Monrovia]*, 775 F.2d [998], 1010 [ (9th Cir.

1986) ].... The same standards apply, and facts sufficient to give rise to a Title VII claim are also sufficient for a section 1981 claim. *Id.*"); *see also Nichols v. Azteca Restaurant Enters.*, 256 F.3d 864, 875 n. 9 (9th Cir.2001) (similarity of Title VII and WLAD); *Xieng v. People's Nat'l Bank*, 120 Wash.2d 512, 844 P.2d 389, 392 (1993) (same).

1998)). This formulation is substantively similar to the *Ellerth/Faragher* defense; the chief difference is that in the negligence context, the plaintiff bears the burden of proving the employer's failure to respond adequately to the harassment, while, in a vicarious liability regime, the defendant must establish the corrective action as an affirmative defense.

And, indeed, it is not clear under which rubric employers are "better off" from an evidentiary and legal standpoint. It might reasonably be argued, in fact, that employers are "better off" in the negligence context, where the plaintiff is required to prove both the employer's knowledge of the harassment (or that it should have known) and that it failed to take reasonable corrective action. In the strict liability context, the plaintiff is required to prove significantly less in the prima facie case: merely that the harasser was his supervisor. Thus, given the different elements that the plaintiff must prove under each theory, it is quite logical that the defense should be available in one context but not the other. Under which theory of liability an employer is "better off" is often in the eyes of the beholder, will vary under the specific facts of the case, and has no bearing on whether the employee may assert the *Ellerth/Faragher* defense. The fact is that vicarious liability and negligence are two distinct bases for liability, each with its own elements of proof.

Given the overwhelming evidence of racial harassment presented at trial, it is hardly surprising that the jury would have imposed liability against Potomac under the negligence theory, as articulated by Jury Instruction 10, which provided in relevant part that the jury should find for Swinton if they determined:

> That management knew, through complaints or other circumstances, of the harassing conduct or language by Fosdick or co-workers and the employer failed to take reasonably prompt, corrective action designed to end the harassment, OR

> That management should have known of the harassment [by] Fosdick or co-workers, due to the pervasiveness of the conduct or language, or through other circumstances, and the employer failed to take reasonably prompt, corrective action designed to end the harassment.

Indeed, in light of the undisputed testimony detailing Fosdick's racial harassment of Swinton, the racial comments and acquiescence of co-workers, and the undisputed testimony that Pat Stewart witnessed the harassment but did nothing to end it, the jury was all but compelled to find for Swinton under this instruction.

Potomac, however, maintains on appeal that, though Stewart was a supervisor, he was not part of U.S. Mat's "management," as identified in Jury Instruction 10, and thus that his knowledge and inaction could not be imputed to the company. We considered the issue of what sort of employees constitute "management" for purposes of imputation to the employer in Title VII law in *Brooks v. City of San Mateo*, 229 F.3d 917, 925 n. 6 (9th Cir.2000). The discussion in *Brooks* relied heavily on the district court opinion in *Lamb v. Household Servs.*, 956 F.Supp. 1511, 1516–18 (N.D.Cal.1997), which featured a thorough survey of the law in this area. The court in *Lamb* identified two categories of employees who qualify as management for these purposes. First, an employee is a member of management if a "supervisor[ ] possessing substantial authority and discretion to make decisions concerning the terms of the harasser's or harassee's employment," such as "authority to counsel, investigate, suspend, or fire the accused harasser, or to change the conditions of the harassee's employment." *Id.* at 1517.

Second, a supervisor who lacks such authority is nonetheless classified as "management" if he "has an official or strong de facto duty to act as a conduit to management for complaints about work conditions." *Id.*; *see also Distasio*, 157 F.3d at 64 ("An official's knowledge will be imputed to an employer when: ' ... (B) the official is charged with a duty to act on the knowledge [of harassment] and stop the harassment; or (C) the official is charged with a duty to inform the company of the harassment.' ") (quoting *Torres v. Pisano*, 116 F.3d 625, 636–37 (2d Cir.1997) (citations omitted)).

It is beyond dispute that Stewart fell into the second category of "management" employees identified by *Lamb:* employees with "an official or strong de facto duty to act as a conduit to management for complaints about work conditions." 956 F.Supp. at 1517.[4] The duty here was official and explicit, not left to chance. By the very terms of U.S. Mat's employee manual, Stewart was charged with accepting reports of harassment; he was the one to whom Swinton was to report first if he experienced harassment. And it is also undisputed that Stewart personally witnessed the harassment; he admitted as much. It could even be said that he participated in it himself by laughing along with Fosdick's jokes. Under these circumstances, we are confident in concluding that Swinton presented overwhelming and undisputed evidence justifying a verdict in his favor under a negligence theory, as outlined in Instruction 10.

■] Potomac maintains, however, that, even if Instruction 10 correctly stated the law, the verdict nonetheless cannot stand because Instruction 12 on the vicarious liability theory was incorrect. This instruction purports to set forth the vicarious liability theory, as well as the *Ellerth /Faragher* defense. It states that the jury may find for the plaintiff if it finds, inter alia, "That John [sic] Fosdick was employed in a supervisory capacity and participated in the harassment." Potomac is correct that this instruction is an erroneous statement of the law. It is not sufficient that Fosdick "was employed in a supervisory capacity." Rather, for vicarious liability to attach, he must have been *Swinton's* supervisor. *See Faragher*, 524 U.S. at 806, 118 S.Ct. 2275 ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by *a supervisor with immediate (or successively higher) authority over the employee.*") (emphasis added).

■ We employ the following standard in evaluating a verdict where the jury was given an incorrect instruction:

An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless. *Coursen v. A.H. Robins Co., Inc.*, 764 F.2d 1329, 1337 (9th Cir.1985). While this standard of review is less stringent than review for harmless error in a criminal case, it is more stringent than review for sufficiency of the evidence, in which we view the evidence in the light most favorable to the prevailing party. *See, e.g., United States v. Adler*, 879 F.2d 491, 495 (9th Cir.1988). In reviewing a civil jury instruction for harmless error, the prevailing party is not entitled to have disputed factual questions resolved in his favor because the jury's verdict may have resulted

---

4. Here we may determine that Stewart was a member of "management" as a matter of law because "[t]he [c]ourt's conclusion depends not on factual findings regarding the job, but on the implications of the employment with[in] the Title VII framework." *Lamb*, 956 F.Supp. at 1516 n. 4 (citing *Horton v. Taylor*, 767 F.2d 471, 478 (8th Cir.1985)).

from a misapprehension of law rather than from factual determinations in favor of the prevailing party. *Caballero v. City of Concord,* 956 F.2d 204, 206–07 (9th Cir.1992). Under the particular facts of this case, we can conclude with confidence that the inclusion of the incorrect vicarious liability instruction was more probably than not harmless. This is not a case where the jury might have found for the defendant under the negligence instruction but instead found for the plaintiff under the erroneous vicarious liability instruction. In such a case, where we could not determine that the jury did not rely on an incorrect statement of the law, the verdict could not stand. But here, as explained above, given the overwhelming evidence presented at trial, it is much more likely than not that Swinton would have prevailed under the negligence theory, as outlined in Instruction 10, even if the jury had not been given the option of considering vicarious liability at all. Our conclusion is further bolstered by the fact that the jury returned a large punitive damages award, which we have held constitutes evidence that an erroneous jury instruction was harmless. *See Lambert v. Ackerley,* 180 F.3d 997, 1009–1010 (9th Cir.1999) (en banc), *cert. denied,* 528 U.S. 1116, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000) (citing *Larez v. Holcomb,* 16 F.3d 1513, 1518 (9th Cir.1994); *Benigni v. City of Hemet,* 879 F.2d 473, 480 (9th Cir.1989)).

In sum, we hold that the district court did not err in its formulation of the negligence theory of employee liability for harassment, and that the promulgation of the erroneous vicarious liability instruction was harmless.

## II. JURY INSTRUCTION/EVIDENTIARY CHALLENGES

### A. Instruction under 42 U.S.C. § 1981

 Potomac proposed an instruction under 42 U.S.C. § 1981, stating that the plaintiff was required to prove both intentional discrimination and "that white employees were not subject to" the same sort of conduct as was Swinton. The district court did not err in declining to give such an instruction. Potomac is correct that § 1981 does require proof of intentional discrimination. But there is no authority for the proposition that the word "intentional" must be included in jury instructions. The cases Potomac cites in this regard, *Evans v. McKay,* 869 F.2d 1341, 1344 (9th Cir.1989), *Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30,* 694 F.2d 531, 536 (9th Cir.1982), and *Williams v. Owens–Illinois, Inc.,* 665 F.2d 918, 927 (9th Cir.1982), do not state that a jury must specifically be told that they must find "intentional" discrimination. *Evans* simply rejected the district court's view that a § 1981 claim required an allegation of conspiracy. *Gay* held that a disparate impact theory of employment discrimination was insufficient to state a claim under § 1981. Similarly, *Williams* concerned the use of statistical evidence to prove employment discrimination. These cases are not relevant here, where there is no conceivable argument that the harassment perpetrated by Fosdick (and imputed to the employer through the doctrines discussed in Section I., *supra*) was not, in fact, intentional.

 The Supreme Court has held that employment discrimination not based on a disparate impact theory is, in fact, intentional discrimination: "The 1991 [Civil Rights] Act limits compensatory and punitive damages awards ... to cases of 'intentional discrimination'—that is, cases that do not rely on the 'disparate impact' theory of discrimination." *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 534, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (citation omitted). Swinton did not base his claim

on a disparate impact theory. Under our precedent, an employer is liable on a hostile environment claim:

> Where the employee proves (1) that he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

*Pavon v. Swift Transp. Co., Inc.,* 192 F.3d 902, 908 (9th Cir.1999). The jury instructions adequately included these elements and mirrored the Ninth Circuit model civil jury instruction for disparate treatment under Title VII, which is analogous for purposes of this analysis.

Nor was Swinton required to prove that white employees were not subject to similar harassment. To suggest, as Potomac does, that it might escape liability because it equally harassed whites and blacks would give new meaning to equal opportunity. Potomac's status as a purported "equal opportunity harasser" provides no escape hatch for liability. The fact that Fosdick may have told jokes about racial or ethnic groups other than African–Americans does not excuse the fact that he racially harassed Swinton. *See, e.g., Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1463–64 (9th Cir.1994) (rejecting claim that harassing language directed at woman was "cured" by fact that harasser also referred to men as "assholes").

**B. General instruction regarding corporations**

■ Potomac asserts that the district court committed prejudicial error by giving a standard instruction regarding corporate liability, Instruction No. 3, which provides in part, "a corporation is responsible for the acts of its employees, agents ... performed within the scope of authority." Potomac argues that this instruction misstates the law of employer liability as stated in *Ellerth, Faragher,* and *Kolstad.*

■ It is true that this instruction, taken in isolation, does not fully state the applicable law of employer liability for harassment by its employees. But the law governing appellate review of jury instructions counsels against looking at any one jury instruction in isolation. Rather, "prejudicial error results when, *'looking to the instructions as a whole,* the substance of the applicable law was [not] fairly and correctly covered.'" *In re Asbestos Cases,* 847 F.2d 523, 524 (9th Cir.1988) (emphasis added) (citing *Pollock v. Koehring Co.,* 540 F.2d 425, 426 (9th Cir.1976)). Taken as a whole, the instructions given by the district court do "fairly and correctly" cover the proper legal standard governing employer liability. As discussed above, Instruction 10 correctly states the law governing employer liability under the negligence standard, and Instruction 12, addressing vicarious liability, though incorrect as to the identification of the supervisor, correctly included the *Ellerth/Faragher* defense. Therefore, it was not prejudicial error for the district court to give a general, boilerplate instruction regarding corporations, when more specific instructions regarding employer liability in the harassment context were given as well.

**C. Admission of summaries of Swinton's statements to counselors**

■ The district court admitted two exhibits consisting of documents prepared by psychologists contacted by Swinton after he left the employ of U.S. Mat. These documents include Swinton's account of the harassment, as related to the therapist. Potomac argued in a motion in limine that these documents consist of hearsay outside

any exception, and it repeats this argument on appeal.

The district court admitted these medical summaries under Federal Rule of Evidence 803(4), which excludes from hearsay, "statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The exhibits at issue appear to reflect the psychologists' collection of a patient's medical history, a routine part of medical diagnosis. Potomac has not offered any evidence, case law, or argument to the contrary. The cases it cites do not discuss Rule 803(4), the medical diagnosis exception; rather, they discuss Rule 803(3), the state of mind exception, and Rule 803(6), the business records exception. In sum, nothing suggests that the district court abused its discretion in admitting the exhibits pursuant to Fed.R.Evid. 803(4).

### D. Refusal to admit evidence relating to timing of retention of counsel and seeking of counseling

 Potomac unsuccessfully sought to admit evidence that Swinton only sought psychological counseling two days after consulting with his attorney. Potomac's argument is that the court's ruling prevented it from effectively cross-examining Swinton and arguing that his emotional distress claim was not genuine. Although another judge might have chosen to admit this timing evidence, the district court fully considered the issue and was within its discretion in making its ruling. Potomac had ample opportunity to cross-examine Swinton about the extent of his mental distress and to explore the basis for the emotional distress claim. In any event,

given the wealth of other evidence admitted, any error on this evidentiary point was almost certainly harmless.

### E. Court's questioning of Hondo Vo

 Potomac asserts that the district court demonstrated bias by improperly questioning Hondo Vo, one of the two co-plant managers at U.S. Mat. The law grants district judges wide discretion to participate in the questioning of witnesses. "It is well established that a trial judge is more than a moderator or umpire." *United States v. Mostella*, 802 F.2d 358, 361 (9th Cir.1986). "It is entirely proper for him to participate in the examination of witnesses for the purpose of clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony." *Id.* The court "overstep[s] the bounds of propriety and deprive[s] the parties of a fair trial," thus requiring a new trial, "only if the record 'discloses actual bias on the part of the trial judge or leaves the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality.'" *Id.* (citing *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525 (9th Cir.1986)).

An examination of the questions the court posed to Hondo Vo reveals little of consequence. Probably the information most harmful to Potomac about which the court inquired of Vo was the fact that Swinton was the only black employee at U.S. Mat.[5] But this colloquy was not the jury's only source of this information. Even before the judge's inquiry, Swinton himself testified to this fact, as did Vickie Thompson, the human resources director. Later, Lloyd Everhard, U.S. Mat's presi-

---

**5.** U.S. Mat's hiring practices were not at issue in the lawsuit.

dent, testified to the same thing. At the beginning of the trial, out of the presence of the jury, Potomac's counsel actually admitted that it was inevitable that the jury would be made aware of this fact during trial. Therefore, the court's elicitation of this information was, if anything, cumulative and superfluous. It did not present the jury with anything about which it was not already aware, and thus was not prejudicial.

### F. Court's statement about "going all over the countryside"

■ Potomac asserts error in the district court's statement, during the direct testimony of company president Lloyd Everhard, "Can we get to the issues of this case with this witness instead of going all over the countryside?" It was not error for the district court to make this statement. An examination of the context in which the court made this comment reveals that it came after several minutes of testimony that were frequently interrupted by objections that the witness' answers were not responsive to the attorney's questions. The court, as was entirely proper, was simply expressing its desire for the witness to answer questions without injecting extraneous information.

### G. District court's "exclusion" of exhibit regarding the investigation

The last of Potomac's asserted evidentiary errors concerns what it terms the "exclu[sion]" of an undated memorandum written by human resources director Vickie Thompson purporting to recount the steps she took in her investigation of the Swinton matter. Potomac misperceives what actually took place; this exhibit was never excluded by the court. When Potomac moved during Thompson's testimony for the admission of the document, Swinton's attorney objected on hearsay grounds. The court responded, "I will reserve on it. Let me see it. Go ahead." Swinton's attorney then said that he also objected on the grounds that the exhibit had not been identified in the pretrial order. The court responded, "I understand the argument and the objection. Let's continue with this witness. Something else." The court never "excluded" the exhibit. It merely "reserved" ruling on the objection, to which Potomac's attorney responded by stating, "I have no further questions."

■ Potomac's attorney could have used the document to refresh the witness's memory on the point. Although he started down this path before he first moved for admission of the exhibit, he never followed-up. He could have argued that the report was admissible as a past recollection recorded under Federal Rule of Evidence 803(5). He chose not to do so, and we are in no position to second-guess his tactics. Potomac's counsel also could have asked the court for an immediate ruling, but, for whatever reason, chose not to. Nor did Potomac raise the issue again or at a later point move for introduction of the exhibit. In any case, Potomac cannot now complain of the exclusion of evidence when the district court never actually excluded it. In addition, it is true that this exhibit was not included in the pretrial order. The court would be well within its discretion to exclude an exhibit not identified in the pretrial order. *See* Fed. R.Civ.P. 16(e); *Byrd v. Guess,* 137 F.3d 1126, 1131–32 (9th Cir.1998); *United States v. Lummi Indian Tribe,* 841 F.2d 317, 320 (9th Cir.1988).

### III. Punitive Damages

#### A. Availability of punitive damages under *Kolstad*

■ In *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144

L.Ed.2d 494 (1999), the Supreme Court clarified the standard to be applied in assessing punitive damages in the employment discrimination context. The Court rejected the contention that punitive damages are available only in cases of an employer's "egregious" conduct. *Id.* at 534, 119 S.Ct. 2118. But it held that, to be liable for punitive damages, the employer "must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536, 119 S.Ct. 2118. Most relevant here, the Court held that, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where those decisions are contrary to the employer's 'good faith efforts to comply with Title VII.'" *Id.* at 545, 119 S.Ct. 2118 (quoting *Kolstad v. Am. Dental Ass'n,* 139 F.3d 958, 974 (D.C.Cir. 1998) (Tatel, J., dissenting)).

The parties generally agree that the answer to the question whether punitive damages are appropriate under *Kolstad* turns on whether the actions (or, rather, the inaction) of Swinton's direct supervisor, Pat Stewart, in the face of Fosdick's behavior, may properly be imputed to Potomac. Potomac takes the position that Stewart—though designated in the employee manual as the proper recipient of harassment complaints by virtue of his position as Swinton's supervisor—was only a low-level supervisor and was thus not employed in a "managerial capacity," permitting punitive damages under *Kolstad,* 527 U.S. at 542–43, 119 S.Ct. 2118.

■■■ Courts in several other circuits have addressed similar situations, where a supervisor who did not actually perpetrate the harassment but nonetheless was responsible under company policy for receiving and acting upon complaints of harassment, failed to take action to remedy the harassment. They have reached the conclusion that the inaction of even relatively low-level supervisors may be imputed to the employer if the supervisors are made responsible, pursuant to company policy, for receiving and acting on complaints of harassment. In *Deters v. Equifax Credit Information Servs., Inc.,* 202 F.3d 1262 (10th Cir.2000), a plaintiff sexually harassed by co-workers complained to the manager designated to receive such reports, but the manager failed to act. The Tenth Circuit held that the employer could not avail itself of *Kolstad*'s "good faith" defense because the very person the company entrusted to act on complaints of harassment failed to do so, and failed with malice or reckless disregard to the plaintiff's federally protected rights. *See id.* at 1271; *see also Cooke v. Stefani Management Servs., Inc.,* 250 F.3d 564, 569 (7th Cir.2001) (Where the "claim [is] that the supervisor failed adequately to remedy the harassment[,] ... the supervisor acts on behalf of the company in enforcing (or failing to enforce) its [ ] harassment policy, and it is therefore fair to attribute his knowledge and acts to the company.") (citing *Deters* ); *cf. Lamb v. Household Credit Servs.,* 956 F.Supp. 1511, 1516–18 (N.D.Cal.1997) (classifying supervisor responsible for passing on complaints of harassment as management for purposes of liability); *Distasio,* 157 F.3d at 64 (same).

■■■ In an effort to invoke the good faith defense, Potomac cites to its written materials forbidding harassment and putting in place anti-harassment procedures as conclusive evidence that it acted in good faith and was thus undeserving of punitive damages. Aside from the fact that, as just noted, Potomac is not entitled to assert the good-faith defense under these circumstances, it is well established that it is insufficient for an employer simply to have

in place anti-harassment policies; it must also implement them. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 517 (9th Cir.2000); *Lowery v. Circuit City Stores,* 206 F.3d 431, 446 (4th Cir.2000) ("While an employer's institution of a written policy against race discrimination may go a long way toward dispelling any claim about the employer's reckless or malicious state of mind with respect to racial minorities, such a policy is not automatically a bar to the imposition of punitive damages.") (citation omitted); *Deffenbaugh–Williams v. Wal–Mart Stores,* 188 F.3d 278, 286 (5th Cir. 1999) ("Wal–Mart's only evidence [of an anti-discrimination policy] was that it (Wal–Mart) encourages employees to contact higher management with grievances. Plainly, such evidence does not suffice to establish, as a matter of law, Wal–Mart's good faith in requiring its managers to obey Title VII."). Surely, U.S. Mat cannot claim to have *implemented* its anti-harassment policy in good faith (even if it were conceived in good faith) when the very employee (Stewart) charged with carrying it out vis-a-vis Swinton laughed along with the "nigger" jokes, did nothing to stop them, and never reported the repeated incidents to higher management. U.S. Mat made a considered judgment to place responsibility for reporting on an employee's direct supervisor. It could well have required some other supervisor or manager further up the chain to be the point of contact. And it could have impressed upon its supervisors, like Stewart, whom it tasked with accepting complaints of harassment, the (we would hope) obvious point that repeatedly subjecting a black employee to "nigger" jokes is wholly unacceptable, and at odds with basic anti-discrimination principles. But it chose not to, and U.S. Mat cannot now be heard to protest that Stewart's position was too "low-level" to warrant imputation of his actions or inaction to the company.

## B. Post-litigation remedial actions

 Potomac next seeks a new trial on punitive damages because the district court excluded evidence of one of the steps taken by U.S. Mat to remedy the discrimination after Swinton filed his discrimination suit. Potomac argues that such evidence is relevant to the issue of punitive damages because it demonstrates the company's good faith once the company became fully aware of the racial harassment; also, such evidence would tend to show that the imposition of punitive damages was not necessary to deter U.S. Mat from future tolerance of harassment. Swinton counters that such evidence was properly excluded as irrelevant.

Swinton cites numerous cases purporting to stand for the proposition that evidence of post-occurrence remediation is nearly always irrelevant in discrimination cases. *See Lam v. Univ. of Hawaii,* 40 F.3d 1551, 1561 n. 17 (9th Cir.1994); *Bouman v. Block,* 940 F.2d 1211, 1227 (9th Cir.1991); *Gonzales v. Police Dep't, City of San Jose,* 901 F.2d 758, 761 (9th Cir.1990). These cases, however, do not sweep as broadly as Swinton asserts. Courts have held, quite sensibly, that evidence of post-event occurrences are rarely relevant to the issue of whether the defendant actually engaged in discrimination. This notion was best summarized in *Gonzales,* 901 F.2d 758 at 762: "Curative measures simply do not tend to prove that a prior violation did not occur."

But the issue of discrimination *vel non* is distinct from the issue whether punitive damages are warranted. *See Kolstad,* 527 U.S. at 534, 119 S.Ct. 2118 ("Congress plainly sought to establish two standards of liability—one for establishing a right to compensatory damages and another, high-

er standard that a plaintiff must satisfy to qualify for a punitive award."). Given the fact of different standards for the imposition of liability and the award of punitive damages, it is not unreasonable to conclude that evidence that may be irrelevant to proving the former is nevertheless relevant to demonstrating the appropriateness of the latter (and vice versa). *See EEOC v. Ind. Bell Tel. Co.*, 256 F.3d 516, 527 (7th Cir.2001) ("[B]ecause the size of a punitive award reflects the jury's assessment of the defendant's blameworthiness, many circumstances that bear on this issue become relevant, even though they could not defeat liability.") (en banc).

In support of its argument, Potomac points us to several recent decisions of the Supreme Court, and one from this court, in which the opinions, in discussing punitive damages, make reference to remedial action undertaken by defendants after the filing of a lawsuit. For example, in *BMW*, 517 U.S. at 565–66, 116 S.Ct. 1589, the Court commented on steps the car maker took to mend its ways, even after the trial court's imposition of the punitive damages award. *See id.* at 579, 116 S.Ct. 1589 ("[I]t is also significant that there is no evidence that BMW persisted in a course of conduct after it had been adjudged unlawful on even one occasion, let alone repeated occasions"); *see also id.* at 579 n. 31, 116 S.Ct. 1589 ("Before the verdict in this case, BMW had changed its policy [relating to the misconduct that led to liability].... *Five days after the jury award*, BMW altered its nationwide policy.") (emphasis added).

Similarly, in *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), the Court noted in the punitive damages context remedial actions taken by the defendant after the filing of the lawsuit. *See id.* at 1680–81 ("The first Tool-

Zall was designed to be virtually identical to [Leatherman's product], but the design was ultimately modified in response to this litigation."); *see also id.* at 1680 ("[After the entry of a preliminary injunction,] Cooper withdrew the original ToolZall from the market and developed a new model with plastic coated handles that differed from the PST."). Most recently, this court, affirming a grant of summary judgment for the employer in a sexual harassment case, relied on the fact that the employer undertook "extensive" investigation of sexual harassment charges after the plaintiff filed a charge with the Equal Employment Opportunity Commission and conducted mandatory training seminars for all employees several months later. *See Kohler v. Inter–Tel. Techs.*, 244 F.3d 1167, 1181–82 (9th Cir.2001).

Potomac thus urges the view that, as a general principle, remedial action undertaken by the defendant, even after the filing of a lawsuit, is necessarily admissible and relevant to the issue whether punitive damages are appropriate. We do not, however, read the cases as necessarily establishing the bright-line rule Potomac urges. The Supreme Court's references to post-litigation remedial action are glancing and ambiguous. The Court did not, to be sure, face head-on the question presented here: whether a defendant must be permitted to present evidence of remedial action undertaken after the filing of a complaint as a means of mitigating a punitive damages claim. We do not interpret the language in *BMW* and *Cooper* as *relying* on evidence of post-occurrence remediation for overturning the punitive damages awards; rather, the Court appears simply to have been recounting a full history of the litigation to give a complete picture of the proceedings. Nonetheless, the Court's passing references are not without some persuasive value in the context of evaluating punitive damages on appeal.

A review of case law from other jurisdictions and academic commentary on this subject reveals no consistent rule on the admissibility of such evidence. *See* Tom Alan Cunningham & Paula K. Hutchinson, *Bifurcated Trials: Creative Uses of the* Moriel *Decision,* 46 *Baylor L.Rev.* 807, 821–22 (1994) ("Some courts have held that evidence of a defendant's rehabilitated character or actions or both are irrelevant to the issue of punitive damages, on the theory that it is the defendant's intent, motive or state of mind at the time of the occurrence which is controlling. However, other courts have found that subsequent occurrences may be relevant to the determination of punitive damages, insofar as such damages are intended to serve as a deterrent to future bad acts.") (footnotes omitted). Some courts have taken the view that such evidence is almost never relevant in assessing punitive damages. For example, in *O'Gilvie v. Int'l Playtex, Inc.,* 821 F.2d 1438 (10th Cir.1987), the jury awarded the plaintiff $10,000,000 in punitive damages following the death of his wife from toxic shock syndrome caused by the defendant's tampons. The district court, notwithstanding the fact that it found the size of the award within reason and entered judgment for the plaintiff in this amount, nonetheless reduced the punitive damages to $1,350,000 upon a promise by Playtex to "discontinu[e] the sale of some of its products, institut[e] a program of alerting the public to the dangers of toxic shock syndrome, and modify[ ] its product warning." *Id.* at 1440–41.

The Tenth Circuit reversed, however, holding that such remittitur was improper because the district court "based its decision to remit on events occurring after trial." *Id.* at 1449. In doing so, the *O'Gilvie* court relied on decisions from both the Kansas Supreme Court and the Oregon Supreme Court holding that evidence of post-occurrence action by the defendant is not relevant in determining punitive damages. *See Ettus v. Orkin Exterminating Co.,* 233 Kan. 555, 665 P.2d 730, 741 (1983) (holding that only factors relevant under Kansas law in determining punitive damages are those involving "the quality of the character of the tortious act itself."). Or, as the Oregon Supreme Court explained, such evidence is generally not relevant to an award of punitive damages because it is more likely to be motivated by a desire to mitigate punitive damages than by genuine contrition:

> Evidence of the parties' conduct subsequent to the event, which produces plaintiff's claim for punitive damages, whether aggravating or mitigating, must be probative of the defendant's state of mind *at the time of the transaction.* [Citation omitted].

> . . . . .

> In the case here at issue the evidence of contrition and a conciliatory attitude of one of the defendant's agents after the complaint was filed has scant relevance respecting the state of mind of other agents of defendant at the time [of the wrong]. Assuming the evidence established the good faith and good will of defendant's president toward plaintiff, such conduct came as a response to the complaint, which prayed for substantial punitive damages. The evidence shows a desire to "buy peace" and minimize the risk of an award of punitive damages and not that the defendant dealt in good faith with plaintiff [at the time of the tort].

*Byers v. Santiam Ford, Inc.,* 281 Or. 411, 574 P.2d 1122, 1125 (1978) (emphasis added); *see also Moran v. Johns–Mansville Sales Corp.,* 691 F.2d 811 (6th Cir.1982) (applying Ohio law); *cf.* David Crump, *Evidence, Economics, and Ethics: What Information Should Jurors be Given to*

*Determine the Amount of a Punitive Damages Award?*, 57 *Md. L.Rev.* 174, 216 (1998) (Fed.R.Evid. 407 "probably disallows the use of subsequent remedial measures to determine liability for punitive damages, and probably the amount as well.").

Other courts, however, permit the introduction of post-occurrence remediation evidence by the defendant as a shield against punitive damages. The Tennessee Supreme Court has held that jurors *must*, in assessing punitive damages, consider "whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused …" *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 902 (Tenn. 1992); *but see* P. Steven Hacker, *Comment, Tennessee Attempts to Tighten the Purse Strings on Punitive Damages:* Hodges v. S.C. Toof & Co., 60 *Tenn. L.Rev.* 983, 995 (criticizing decision on grounds that "allowing such evidence to be admitted during a punitive damages stage may merely present the bad actor with the opportunity to mitigate punitive damages through use of a recently initiated subsequent remedial measure as window dressing."); *see also Spaeth v. Union Oil Co.*, 710 F.2d 1455 (10th Cir.1983) (distinguished by court in *O'Gilvie* ); *Lazenby v. Godwin*, 60 N.C.App. 504, 299 S.E.2d 288 (1983) (reversing judgment on grounds that trial court improperly excluded evidence of remedial actions undertaken by defendant after allegedly fraudulent acts).

We decline to endorse here, in the context of an employment discrimination suit, either the view that such evidence is always relevant, or that it is always irrelevant. We note that nearly all the courts that have discussed this issue have done so in products liability suits, which present their own unique issues and problems. In most such suits, for example, the defendant attempts to exclude under Federal Rule of Evidence 407[6] any evidence of post-occurrence remediation, fearing that introduction of such evidence tends to show consciousness of guilt. In the employment discrimination context, however, post-occurrence remediation is part and parcel of the legal framework. Under the negligence standard, the plaintiff must prove that the employer failed to take reasonably prompt corrective action once it learns of the harassment. And, in the vicarious liability context, the *Ellerth/Faragher* defense encourages employers to introduce such evidence as a defense to liability. Thus while the case law cited above highlights the conflicting policy implications of admitting or excluding this category of evidence, it does not compel any particular answer here.

Accordingly, we hold that a district court may, in its discretion, allow a defendant/employer to introduce evidence of remedial conduct undertaken in response to its discovery of discrimination as a means to mitigate punitive damages. Likewise, where the plaintiff, in arguing for punitive damages, contends that they are necessary to "teach the defendant a lesson," post-charge remediation may be

6. Rule 407. Subsequent Remedial Measures When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

relevant to defendant's posture. The plaintiff can, of course, make arguments about prejudice, too little too late, and relevance of remedial conduct. Adoption of this approach has the advantage of encouraging employers to implement remedial measures, while leaving to the trial court, which has a front-row seat in evaluating the evidence, the discretion to determine the limitations on such evidence. In framing this discussion, we do not attempt to prejudge in all cases whether remedial conduct is admissible, even if it occurs after the plaintiff has filed a charge with an administrative agency such as the EEOC, or has in fact filed a lawsuit. Rather, the determination as to whether the evidence is too far afield, temporally or by subject matter, is left, in the first instance, to the discretion of the trial court.

 While we stress that district courts have discretion, under traditional relevance principles, to admit or exclude evidence of remediation undertaken after the filing of a complaint, we do offer some guidance. *Ellerth, Faragher,* and *Kolstad* all clearly stand for the proposition that employers should be encouraged to institute anti-harassment measures, and must be given the opportunity to present evidence of such efforts. Thus an employer should be given the opportunity to present evidence that tends to prove that it undertook prompt and appropriate remedial measures, whether such measures occurred before or after the plaintiff happened to file his complaint.

Consider the situation where the plaintiff quits based on a constructive discharge, files a § 1981 suit (or an EEOC complaint) the next day, and then seeks to bar any evidence of post-complaint investi-

gation and follow-up. If a court were to exclude all post-complaint remediation evidence, the employer might well be denied the *Ellerth/Faragher* defense and the opportunity to demonstrate good faith as an argument against punitive damages. In contrast, if the plaintiff files an EEOC complaint, then waits until the last possible day to a file a lawsuit, and only then does the employer take any remedial action, the circumstances may well be different. The point is that the timing and nature of remedial action are case-specific and will not always fit in a neat box. From a policy standpoint, the law should encourage employers to undertake remedial action without regard to their ultimate liability.

 We also wish to emphasize that evidence of post-charge remediation would not automatically bar the imposition of punitive damages. A jury would, of course, be free to discount such evidence on the grounds that the remedial action undertaken by the employer is nothing but a sham concocted by defense attorneys as a strategy to avoid punitive damages. In the first instance, the trial court acts as a gatekeeper with respect to relevance. But once this evidence is admitted, the system relies on the jury to determine whether the remedial conduct is nothing more than window dressing. We have little doubt that some juries will cast a skeptical eye on such evidence of after-the-fact good works. But the jury might also find that such remedial actions were indeed bona fide efforts to repent and to prevent the reoccurrence of similar harassment in the future, thus lessening the need for additional deterrence in the form of punitive damages.[7] *See* Hacker, *supra* at 994 (evidence

---

7. Assume, for example, that—contrary to the evidence presented at trial—Swinton filed suit the week after he quit, and that high-level managers at U.S. Mat and Potomac immedi-

ately undertook swift and decisive action to remedy the situation by firing or disciplining anyone who had uttered a racial slur, demoting anyone who had witnessed the harass-

of remedial measures "allows the defendant to illustrate some deterrence has already occurred ...". We also stress that our holding here does nothing to alter the underlying rules regarding a district court's determination of relevancy under the rules of evidence. *See* Fed R. Evid. 401–03.

Turning, then, to the instant case, we conclude that the district court did not abuse its discretion in limiting, in response to Swinton's motion in limine, evidence of remedial action undertaken after Swinton filed his lawsuit. In fact, it appears that, despite the court's ruling, Potomac was still able to introduce evidence of remedial action undertaken after the filing of the suit. Specifically, human resources manager Vickie Thompson testified about the steps she undertook to investigate Swinton's charges, including interviews she conducted after Swinton filed suit. As a consequence, the court's ruling had the effect of excluding only one piece of evidence: the fact that all U.S. Mat supervisors and managers underwent anti-harassment training in September 1997, approximately seven months after Swinton quit, five months after he filed his unemployment claim alleging racial harassment, and two months after he filed suit. The district court was within its discretion to exclude this single piece of evidence. Such evidence, if introduced, would have done little, if anything, to undermine the uncontroverted evidence that, even after everyone in management became fully cognizant of Swinton's allegations, no

one—not Pat Stewart, none of those at U.S. Mat who had witnessed the harassment and had done nothing about it, and none of the workers who had actually hurled the epithet "nigger" at Swinton—was ever fired, demoted, or in any way disciplined.[8]

Potomac also argues that the exclusion of evidence of remedial action undertaken after the suit was filed was particularly prejudicial because Swinton's counsel stated in his closing argument, while discussing punitive damages, that U.S. Mat "did nothing.... They should have done something." Potomac asserts that it was unfair to allow Swinton to argue that U.S. Mat "did nothing" in response to the harassment, but to preclude Potomac from introducing evidence tending to rebut this charge. Potomac's argument is unavailing, for two reasons. First, Potomac never made a contemporaneous objection to this argument, thus subjecting the error alleged only to the highly deferential "plain or fundamental error" standard of review, where we will reverse only "where the integrity or fundamental fairness of the proceedings in the trial court is called into serious question." *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1148 (9th Cir.2001). Even were we to assume that Swinton's counsel's argument unfairly prejudiced Potomac, the level of prejudice does not rise to the level of "plain or fundamental error ... where the integrity or fundamental fairness of the proceedings in the trial court is called into serious question." *Id.* Second, a close reading of

---

ment but had failed to do anything about it, instituting a better reporting system, and sending all employees and managers to anti-harassment training. Under such circumstances, we would think that Potomac would be entitled to present this evidence as tending to demonstrate that it was capable of mending its ways without being hit over the head with the club of a significant punitive dam-

ages award. But such circumstances were not present in this case.

**8.** Fosdick himself quit soon after Swinton left, leaving Potomac little opportunity to discipline him. We can only speculate whether the company would have disciplined him had he not quit on his own.

the argument to which Potomac now objects reveals that the allegation that Potomac "did nothing" is a reference to a failure to train workers not to engage in harassment *before* the events about which Swinton complained—not to any actions that Potomac may have taken, or failed to take, after the filing of the suit. Recognizing that statements by Swinton's counsel were argument, not evidence, we also note that Potomac did introduce evidence of its investigation and follow-up, thus belying the claim that it did nothing.

In sum, given the particular circumstances presented here, the district court did not abuse its discretion in excluding, on a limited basis, evidence of remedial actions undertaken after Swinton filed suit.

## C. Constitutional limits on punitive damages

 Lastly, we must consider de novo whether the punitive damages award of $1,000,000 was constitutionally excessive under *BMW. Cooper Indus.*, 121 S.Ct. at 1683. In *BMW*, the Supreme Court held that an award of punitive damages violates constitutional due process requirements if "grossly excessive." *BMW*, 517 U.S. at 562, 116 S.Ct. 1589. The Court announced three "guideposts" to assist courts in determining whether an award violates this standard: the "degree of reprehensibility" of the tortfeasor's actions; "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damage award"; "and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* at 575, 116 S.Ct. 1589. Although the district court did not conduct a *BMW* analysis, we need not remand because "the constitutional issue merits de novo review." *Cooper Industries*, 121 S.Ct. at 1683.

### 1. Reprehensibility

We first must assess the degree of reprehensibility of Potomac's conduct. In so doing, we are mindful of the fact that the conduct for which Potomac was found liable was not Fosdick's "nigger" jokes per se, but rather the action—or, rather, inaction—of the company's proxies in response to them. But, of course, the reaction to the jokes cannot be divorced from the jokes themselves; one can only judge the reaction of the company with reference to that to which it reacted (or failed to react).

Potomac asserts on appeal that, though "tasteless, objectively offensive joking" occurred in its workplace, it was, at the end of the day, nothing more than "joking," and did not justify such a large punitive damages award. We reject this benign characterization of the evidence presented at trial. Swinton made clear on the witness stand that he did not consider the language to which he was subject a joke. The only African–American employee of about 140 at the U.S. Mat plant, he was subject to daily abuse featuring the word "nigger," "perhaps the most offensive and inflammatory racial slur in English, ... a word expressive of racial hatred and bigotry." *Merriam–Webster's Collegiate Dictionary* 784 (10th ed.1993). Potomac presented its "joke" theory of the case to the jury. Had they believed it, they would have found for Potomac, as mandated by the jury instructions that required Swinton to prove that "the plaintiff regarded the conduct as undesirable and offensive." As signaled by the jury's verdict on liability and damages, they believed that what went on at U.S. Mat was "undesirable and offensive,"—not a "joke"—and we do not hesitate before agreeing.

Nor do we agree with Potomac's contention that a large punitive damages award is unjustified because "this [is not] a case where the plaintiff complained and his

complaints went unaddressed." As explained above, Potomac made Stewart its proxy by placing him in the position as recipient of Swinton's harassment complaints. For the purposes of liability and damages, what Stewart knew, Potomac knew, and what Stewart failed to do, Potomac failed to do as well. Despite witnessing the constant barrage of racial harassment directed at Swinton, Stewart (and thus Potomac) did absolutely nothing to stop it. Despite testimony that offensive racial language was ubiquitous at U.S. Mat, there is nothing to indicate that anyone in the company did anything to combat this problem until officially informed by a state agency that Swinton was charging racial harassment.

Without minimizing the effect of the ugly word and the racially-charged jokes that permeate this case, we do note, however, that the Supreme Court in *BMW* outlined what one court has termed a "hierarchy of reprehensibility," with acts and threats of violence at the top, "followed by acts taken in reckless disregard for others' health and safety, affirmative acts of trickery and deceit, and finally, acts of omission and mere negligence." *Florez v. Delbovo*, 939 F.Supp. 1341, 1348–49 (N.D.Ill.1996) (citing *BMW*, 517 U.S. at 575–76, 116 S.Ct. 1589). Without deciding where exactly on the "hierarchy of reprehensibility" the conduct in this case falls, it is undisputed that it did not involve either actual violence or the threat thereof. While we certainly have nothing good to say about Potomac's conduct, we recognize that it does not amount to the worst kind of tortious conduct a defendant can commit.

In sum, we have no trouble concluding that the highly offensive language directed at Swinton, coupled by the abject failure of Potomac to combat the harassment, constitutes highly reprehensible conduct justifying a significant punitive damages award.

## 2. Ratio

We next examine the ratio of the punitive damages award to the amount of compensatory damages: $1,000,000 to $35,600, which yields a ratio of 28:1. We admit to uncertainty as we undertake this analysis. Though we are instructed that punitive damages must bear a "reasonable relationship" to compensatory damages, *BMW*, 517 U.S. at 580, 116 S.Ct. 1589, the Supreme Court has also repeatedly held, "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case," *id.* at 582–83, 116 S.Ct. 1589 (internal citations and quotation marks omitted). "Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.* at 582, 116 S.Ct. 1589.

This is precisely the type of case posited by the Court in *BMW*—the low award of compensatory damages supports a higher ratio of punitive damages because of "particularly egregious" acts and "noneconomic harm that might have been difficult to determine." *Id.* at 582, 116 S.Ct. 1589. The back pay damages were necessarily low because Swinton was paid only $8.50 per hour. And the personal distress and indignity visited upon Swinton are difficult to calculate. Indeed, as the Tenth Circuit has noted, "where the injury is primarily personal, a greater ratio may be appropriate." *Deters*, 202 F.3d at 1273.

Recognizing that the defendant's wealth can also be a factor in assessing the ratio,

Potomac conceded that "The award was [not] out-of-line with defendant's net worth." Potomac is a multi-million dollar company with net sales exceeding $90 million in recent years. The ratio of the award is not excessive in view of this financial picture.

We are left, then, with the Supreme Court's upper limit of a "breathtaking 500 to 1" ratio, *id.* at 583, 116 S.Ct. 1589, which "raise[s] a suspicious judicial eyebrow," *TXO Production Corporation v. Alliance Resources Corporation,* 509 U.S. 443, 481, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (O'Connor, J., dissenting), along with the Court's acknowledgment that "[i]n most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified. . . ." *BMW,* 517 U.S. at 583, 116 S.Ct. 1589. We find little comfort in trying to discern parameters from other cases because the circumstances vary so widely. Such an exercise simply results in a scatter graph that pushes the decision toward a mathematical bright-line, a path that we eschew in accord with the Supreme Court guidelines.

It also bears noting that the jury was warned not to go hog wild. Even in the face of repeated admonitions by *Swinton's* counsel that the jury "[should] not get carried away," that it would be "wrong" to award ten million dollars, and that they should "[b]e more moderate," the jury awarded significant punitive damages. The large award appears to have been calculated by the jury to effect the twin goals of punitive damages: "punishing unlawful conduct and deterring its repetition." *Id.* at 568, 116 S.Ct. 1589.

Finally, under *BMW* we are permitted to address the reasonable relationship between the punitive damages and "the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." *Id.* at 581, 116 S.Ct. 1589

(quoting *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 21, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). But for Swinton's decision that he couldn't take it any longer and thus had to quit, nothing in the record suggests that U.S. Mat would have done anything to address a workplace replete with racial and ethnic slurs, not only about blacks, but also directed at other minorities and ethnic groups. The fact that the harm from unchecked racial harassment occurring day after day cannot be calculated with any precision does not deflate its magnitude.

In view of the factors articulated by the Court, we cannot say that the ratio is constitutionally excessive or jars our "constitutional sensibilities." *Haslip,* 499 U.S. at 18, 111 S.Ct. 1032. Our conclusion is not inconsistent with results reached in other circuits. For example, in *Deters,* the plaintiff, a woman, was "daily" called a "F"ing B" and told "come here, you C," and subject to myriad other crude sexual comments. 202 F.3d at 1266–67. The jury awarded her $5,000 in compensatory and $1,000,000 in punitive damages; the district court reduced the punitive damages award to $295,000 based on the Title VII damages cap established by 42 U.S.C. § 1981a(b)(3), resulting in a ratio of 59:1, much greater than the ratio here. *Deters,* 202 F.3d at 1266. Notably, the Tenth Circuit, in upholding the high-ratio award, relied on *BMW's* admonition that a relatively low award of compensatory damages may support a high ratio "if a particular egregious act has resulted in a small amount of economic damages." *Id.* at 1273; *see also EEOC v. W & O, Inc.,* 213 F.3d 600, 616 (11th Cir.2000) (upholding punitive damages of twenty-six and sixteen times compensatory damages in pregnancy discrimination case); *Romano v. U–Haul Int'l,* 233 F.3d 655, 673 (upholding punitive damages award nineteen times award of

compensatory damages: "Given the low actual damages due to appellee's short period of employment and the difficulty in measuring actual damages in a case involving 'primarily personal' injury, we hold that this is a constitutionally acceptable ratio between punitive and compensatory damages." (citing *Deters,* 202 F.3d at 1273)); *Lambert v. Ackerley,* 180 F.3d 997 (upholding award to six plaintiffs of $4.1 million in punitive damages on back pay plus emotional distress damages of $75,000 per plaintiff; *not* discussing *BMW* ).

### 3. Analogous civil penalties

The last of the *BMW* guideposts which we must consider is "the difference between this remedy [punitive damages] and the civil penalties authorized or imposed in comparable cases." 517 U.S. at 575, 116 S.Ct. 1589. There are no "civil penalties" for the type of conduct for which Potomac was held liable in this case. In applying this guidepost, however, several courts have analogized to Title VII's $300,000 damages cap. *See, e.g., Kim v. Nash Finch Co.,* 123 F.3d 1046, 1068 (8th Cir. 1997); *Florez,* 939 F.Supp. at 1348 (stating that Title VII cap "gives at least some indication of Congress's judgment as to the approximate level of punitive damages" in § 1981 cases). We do not mean here to imply that the Title VII damages cap applies in § 1981 cases; it does not. *See, e.g., Kim,* 123 F.3d at 1067 ("The Title VII statutory cap does not apply to limit the recovery under 42 U.S.C. § 1981."). But the Supreme Court has nonetheless directed us to refer to such analogous sanctions in determining the constitutionality of a punitive damages award. *See BMW,* 517 U.S. at 583–585, 116 S.Ct. 1589. This factor, unlike the reprehensibility and ratio guideposts, weighs in favor of a reduction. That said, however, we also hasten to add that Congress has not seen fit to impose any recovery caps in cases under § 1981

(or § 1983), although it has had ample opportunity to do so since the 1991 amendments to Title VII.

In sum, after analyzing the punitive damages award here in light of the three *BMW* guideposts, we cannot say that the punitive damages award amounts to a constitutional due process violation.

### CONCLUSION

We affirm the jury's verdict as to liability, as to the award of compensatory damages, and as to the amount of punitive damages.

AFFIRMED.

### APPENDIX

Selected Jury Instructions

Instruction No. 3

Under the law, a corporation is a person. It can act only through its employees, agents, directors, or officers. Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.

Instruction No. 10

To establish his claim of racial harassment under federal or state law against the defendant the plaintiff has the burden of proving each of the following propositions:

1. That there was language or conduct of a racial nature, or that occurred because of the plaintiff's race; and

2. That this language or conduct was unwelcome in the sense that the plaintiff regarded the conduct as undesirable and offensive; and

3. That the conduct or language complained of was so offensive or pervasive that it could reasonably be expected to alter the conditions of plaintiff's employment;

4. That management knew, through complaints or other circumstances, of the harassing conduct or language by Fosdick or co-workers and the employer failed to take reasonably prompt, corrective action designed to end the harassment, OR

5. That management should have known of the harassment [by] Fosdick or co-workers, due to the pervasiveness of the conduct or language, or through other circumstances, and the employer failed to take reasonably prompt, corrective action designed to end the harassment.

If you find from your consideration of all of the evidence that each of these propositions has been proved, then your verdict should be for the plaintiff on the state and federal harassment claims.

Instruction No. 12

If you find that the defendant neither knew nor should have known of the racially harassing conduct, plaintiff may still prevail under federal law if he proves each of the following propositions:

1. That there was language or conduct of a racial nature, or that occurred because of the plaintiff's race; and

2. That this language or conduct was unwelcome in the sense that the plaintiff regarded the conduct as undesirable and offensive; and

3. That the conduct or language was so offensive or pervasive that it could reasonably be expected to alter the conditions of the plaintiff's employment; and

4. That John Fosdick was employed in a supervisory capacity and participated in the harassment.

The defendant has the burden of proving each of the following by a preponderance of the evidence:

1. That the employer exercised reasonable care to prevent and correct promptly any racially harassing behavior, and

2. That the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

If the plaintiff has failed to prove each of the things on which plaintiff has the burden of proof, your verdict should be for the defendant on this claim.

If you find that each of the things on which plaintiff has the burden of proof has been proved, your verdict should be for the plaintiff, unless you also find that each of the things on which the defendant has the burden of proof has also been proved, in which your verdict should be for the defendant on this claim.