**SOUTHERN UNION COMPANY,**
a Delaware corporation,
Plaintiff,

v.

**SOUTHWEST GAS CORPORATION,**
a California corporation, et al.,
Defendants.

**No. CV991294–PHXROS.**

United States District Court,
D. Arizona.

Aug. 1, 2003.

See, also, 281 F.Supp.2d 1117, 2003 WL 22089441; 2002 WL 1301526.

Eric D. Herschmann, Jessica Mann, Michael M. Fay, Kasowitz Benson Torres & Friedman LLP, New York City, Tom Q. Ferguson, Shelly L. Dalrymple, Sam P. Daniel, Jr., Doerner Saunders Daniel & Anderson, Tulsa, OK, Christina Carlson Dodds, Daniel W. Bishop, II, Daniel W. Bishop II PC, Austin, TX, for Plaintiffs.

Michael J. O'Connor, Esq., Douglas F. Behm, Michael ScottMcCoy, Michael J. Farrell, Jennings Strouss & Salmon, PLC, Phoenix, AZ, Seth Aronson, Esq., Marc F. Feinstein, Patrick Lynch, Floy E. Andrews, O'Melveny & Myers LLP, Los Angeles, CA, Michael R. Klein, Steven F. Cherry, Howard M. Shapiro, David P. Donovan, Wilmer Cutler & Pickering, Washington, DC, Michael J. Bowe, Kasowitz Benson Torres & Friedman LLP, New York City, Thomas R. Sheets, Southwest Gas Corporation, Steve Morris, Kristina Pickering, Morris Pickering & Sanner, Las Vegas, NV, Paul J. Cleary, Scott R. Rowland, Boone Smith David Hurst & Dickman, Tulsa, OK, for Defendants.

### Order

SILVER, District Judge.

On December 18, 2002, after a jury trial of nearly two months, the jury returned a verdict for Plaintiff Southern Union Company against Arizona Corporation Commissioner James Irvin, the only remaining Defendant at the conclusion of trial, and

assessed a punitive damages award of $60,000,000. Southern Union prevailed on two causes of action, intentional interference with business expectancy and intentional interference with contractual relations, both arising from Irvin's activities generally in 1999 which caused the failure of an attempted merger between Southern Union and Southwest Gas Corporation. At the time of both the attempted merger and the jury verdict, Irvin held elective office as a Commissioner on the Arizona Corporation Commission. He has filed an Amended Motion for JNOV or in the Alternative for New Trial or Remittitur [Doc. # 2238], seeking a new trial or remittitur on the punitive damage award of $60,000,000.

Following the Supreme Court's decision in *State Farm Mutual Auto. Ins. Co. v. Campbell*, —— U.S. ——, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (*Campbell*), the parties submitted supplemental briefing on the issue of punitive damages: Commissioner Irvin's Supplemental Memorandum of Law [Doc. # 2244], Southern Union Company's Response [Doc. # 2245], and Commissioner Irvin's Reply [Doc. # 2246]. Following a hearing on June 2, 2003, the Court ordered further supplemental briefing, and both Southern Union [Doc. # 2253] and Commissioner Irvin [Doc. # 2254] submitted additional memoranda. Having considered the briefing of the parties, Commissioner Irvin's motion will be denied, and the punitive damages award of $60,000,000 assessed by the jury will be upheld.

### Analysis

### A. Punitive Damages under Arizona Law

 Commissioner Irvin's initial argument is that there is insufficient evidence to sustain an award of punitive damages under Arizona law. "To recover punitive damages, the plaintiff must ... introduce sufficient evidence to allow the trier-of-fact to calculate a punitive damage award that is reasonable under the circumstances." *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 497, 733 P.2d 1073, 1080 (Ariz.1987). *Hawkins* specifies three non-exclusive factors that the Court should consider in evaluating an award of punitive damages: the financial position of the defendant, the nature of the defendant's conduct, and the profitability of the defendant's conduct. *Id.* at 501–2, 733 P.2d 1073. *See also Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 134, 907 P.2d 506, 520 (Ariz.App.1995) (outlining and applying three *Hawkins* factors). "A plaintiff is not required to put on proof of every factor, nor is any single factor a prerequisite to recovery of punitive damages. Rather, the plaintiff must produce evidence so that the amount awarded may not be said to be so unreasonable in regard to the circumstances as to show the influence of passion or prejudice." *Hawkins*, 152 Ariz. at 501, 733 P.2d 1073 (quotations and citations omitted). The Court must show considerable deference to the judgment of the jury:

> We vest the trier-of-fact with discretion to award an amount of punitive damages that, in its judgment, will punish the defendant and serve as an example to deter similar future misconduct. Once exercised, this discretion should not be disturbed unless the award is the result of passion or prejudice. The appropriate test of passion or prejudice is whether the verdict is so manifestly unfair, unreasonable, and outrageous as to shock the conscience of the court. *The amount of the award alone is not sufficient evidence to prove the jury acted with passion or prejudice.*

*Hawkins*, 152 Ariz. at 501, 733 P.2d 1073 (quotations and citations omitted) (emphasis added).

The first consideration is the financial position of the defendant. *Hawkins,* 152 Ariz. at 497, 733 P.2d 1073. "It is axiomatic that the wealthier the wrongdoing defendant, the greater the award of punitive damages necessary to punish him. We recognize, however, that the award must not financially kill the defendant." *Id.* at 501, 733 P.2d 1073.

Irvin argues that the punitive damages award in this case must be overturned because it would "financially kill" him based on the evidence that Southern Union introduced at trial. At trial, Southern Union produced evidence of one financial statement of Irvin's and his wife's assets (Exhibit 435) which reflected that on an undisclosed date they had $859,000 in assets, excluding Irvin's interests in his family's business. Tr. at 4770–71. On cross-examination, Irvin conceded that he had stock in the family business but claimed to have no knowledge of how much the stock or the company was worth. Tr. at 4762. Later, Irvin claimed, without any offer of proof or substantiation, that his individual net worth was "considerably less" than that reflected on the joint financial statement. Tr. at 4821.

Southern Union, however, presents case law establishing that the burden is *on Irvin* to show that the verdict would actually financially destroy him. In Arizona, "there is no requirement that specific financial circumstances be presented. A defendant who has not introduced evidence of his financial circumstances many not complain of its absence." *Asphalt Engineers, Inc. v. Galusha,* 160 Ariz. 134, 138, 770 P.2d 1180, 1184 (Ariz.App.1989). *See also Nienstedt v. Wetzel,* 133 Ariz. 348, 357, 651 P.2d 876, 885 (1982) (holding that "a defendant may not complain of the absence of evidence of his wealth when he has made no effort to introduce such evidence"); *Hawkins,* 152 Ariz. at 501, 733 P.2d 1073 ("A plaintiff is not required to put on proof of every factor, nor is any single factor a prerequisite to recovery of punitive damages. *See Nienstedt v. Wetzel,* 133 Ariz. at 357, 651 P.2d at 885 (evidence of defendant's wealth not required to recover punitive damages).") (citation in original). Further, Arizona courts have held that "the sole fact that an award exceeds a defendant's present assets" is not sufficient grounds for setting it aside. *Puz v. McDonald,* 140 Ariz. 77, 79, 680 P.2d 213, 215 (Ariz.App.1984).

Irvin presented no evidence that the award would actually financially destroy him. The only evidence of his net worth in the record was offered by Southern Union. Irvin disputed the amount by merely testifying that the evidence was not accurate. Without corroboration of this statement and other evidence, Irvin has waived his right to complain of his absence of wealth.

The second consideration in assessing the award of punitive damages is "the nature of the defendant's conduct, including the reprehensibility of the conduct and the severity of the harm likely to result, as well as the harm that has occurred, from the defendant's conduct." *Hawkins,* 152 Ariz. at 497, 733 P.2d 1073. More particularly, "[t]he more reprehensible the act and the more severe the resulting harm, the greater the award of punitive damages that is reasonable under the circumstances. The duration of the misconduct, the degree of defendant's awareness of the harm or risk of harm, and any concealment of it are elements to consider in judging the reprehensibility of the defendant's conduct." *Id.* at 497, 733 P.2d 1073.

Irvin argues that his conduct was not reprehensible, because it took place over a short period of time (two months) and resulted in only economic injuries. Further, Irvin argues that any concealment of his activities should not be considered because the concealment itself was not the

proximate cause of the injury. Irvin's first objection is meritless, because Southern Union presented evidence at trial of a determined effort, over a number of months, to disrupt the Southern Union–Southwest Gas merger. The evidence also showed that during this time, Irvin abused his privileges as a Corporation Commissioner to attempt to disrupt the deal, while purposely concealing his activities from the Commission. Additionally, Irvin was acutely aware of the risk of harm to Southern Union, a fact which the jury clearly found in order to find him liable of an intentional tort and award an impressive amount of punitive damages. Southern Union accurately argues that this type of conduct should be severely deterred, which is a key purpose of an award of punitive damages. Finally, the concealment is also an "element[ ] to consider in judging the reprehensibility of [Irvin's] conduct." *Hawkins*, 152 Ariz. at 497, 733 P.2d 1073.

Irvin's concealment *is* relevant to determining the degree of reprehensibility. Irvin relies on *Saucedo v. Salvation Army*, 200 Ariz. 179, 24 P.3d 1274 (Ariz.App. 2001), in which the Court of Appeals overturned an award of punitive damages where the requisite evil mind was inferred from a motorists' flight from the scene of an accident after he negligently struck and killed a pedestrian. The Court held that the flight was not the proximate cause of the injury, and therefore was not a basis for punitive damages. However, in *Saucedo*, the flight had very little relevance to whether the motorist committed the tort with an evil mind because it occurred after the tort was completed, and the flight did not proximately cause the injury because the victim would have died whether or not the motorist had stopped. In this case, the evidence of concealment clearly bears upon whether Irvin had the required mental state of intent to commit the tortious acts. Further, it directly relates to Irvin's ability to undercut the merger while avoid-

ing any public scrutiny anticipated in his role as a public official with significant authority to affect the decision of which company merged with Southwest Gas. The concealment was part of Irvin's pattern of activities constituting the legal "proximate cause" of the injury. The jury was instructed on proximate cause in accordance with Arizona law. Instruction No. 28 [Doc. # 2196] reads, "Before you can find James Irvin at fault, you must find that his conduct was the cause of Southern Union's injury. To find that James Irvin's conduct caused Southern Union's injury, Southern Union must prove that Southwest Gas Corporation would not have breached its contract with Southern Union, and/or terminated Southern Union's business expectancy in acquiring Southwest Gas, but for the conduct of James Irvin." By virtue of the verdict, the jury found Irvin's conduct was the proximate cause of both torts.

The final *Hawkins* factor, the profitability of Irvin's conduct to himself, is not relevant here. There was evidence, however, that he would have been personally advantaged by a merger with ONEOK. First, there was reliable evidence that the management of Southwest Gas preferred ONEOK as a merger partner over Southern Union. Further, the evidence supported the inference that Irvin perceived that his allegiance to the management of Southwest Gas would enhance his political career. Apart from this, it is not necessary, to support an award of punitive damages, that Southern Union prove that Irvin personally profited from his tortious actions. *Hawkins*, 152 Ariz. at 501, 733 P.2d 1073. Therefore, the award of punitive damages is not in violation of or inconsistent with Arizona law.

**B. Due Process**

 Following recent Supreme Court precedents, the Court must determine

whether the punitive damages award is constitutional as a matter of due process. In 1996, the Supreme Court decided *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (*Gore*), which established that punitive damage awards may be so "grossly excessive" as to "enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." In *Campbell,* —— U.S. at ——–——, 123 S.Ct. at 1520–21, the Supreme Court held unconstitutional a $145 million punitive damages award based on a compensatory damage award of $1 million. In doing so the Court reaffirmed that trial courts must consider the three central "guideposts" first specified in *Gore:* the degree of reprehensibility of the defendant's misconduct, the disparity between actual or potential harm suffered by the plaintiff and the punitive damages award, and the difference between punitive damages and civil or criminal penalties authorized or imposed in comparable cases. To determine whether the $60 million award is unconstitutionally excessive, the Court must examine each guidepost.

### (1) Degree of reprehensibility

■ "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Campbell,* —— U.S. at ——, 123 S.Ct. at 1521 (quoting *Gore,* 517 U.S. at 575, 116 S.Ct. 1589). The Court in *Campbell* listed five factors to consider in determining the reprehensibility of a defendant's conduct: "the harm caused was physical rather than economic, the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Campbell,* ——

U.S. at ——, 123 S.Ct. at 1521. The Court clarified that "[t]he existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.* at 1521.

In this case, the degree of reprehensibility of Irvin's conduct is marked by two factors: repeated actions and harm caused by intentional trickery and deceit. As discussed in the previous section, Irvin's tortious actions were planned and perpetrated over a number of months, and were not singular or isolated attempts to disrupt the merger, even if the rejection of the merger occurred at only one Board meeting. Also, the harm was the result of Irvin's intentional conduct, which the jury determined was accomplished with an evil mind, manifested by deception and trickery. Irvin was in a vital position to influence the Southwest Gas Board of Directors on which company would merge with Southwest Gas. As established at trial Irvin, as a Corporation Commissioner, had quasi-judicial responsibilities, requiring scrupulous honesty and neutrality in his dealings with all merger candidates, and in his serving the best interests of the public. "To be sure, infliction of economic injury, especially when done intentionally through affirmative acts of misconduct ... can warrant a substantial penalty." *Gore,* 517 U.S. at 576, 116 S.Ct. 1589. Though striking down a punitive damages award, the Court in *Gore* was careful to distinguish the facts in Gore from cases such as this one. "[T]he record in this case discloses no deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive, such as were present in *Haslip* and *TXO.*" *Id.* at 579, 116 S.Ct. 1589 (citing *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) and *TXO Production Corp. v. Alliance Resources Corp.,* 509

U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)). In contrast, the record in this case discloses all of these factors.

Most of the Supreme Court's analysis of reprehensibility in *Campbell* is simply inapplicable to this case. *Campbell* and *Gore* were primarily concerned with a defendant being punished for actions it took in other states, particularly when those actions may have been lawful if they took place in other states. *Campbell*, —— U.S. at —— – ——, 123 S.Ct. at 1521–23. While *Campbell* does indicate that "[d]ue process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the reprehensibility analysis," the Court's primary concern is that "[a] defendant's dissimilar acts, independent of the acts upon which liability was premised, may not serve as the basis of punitive damages." *Id.* at 1523. Apart from this, Irvin's liability is premised on a series of events causing a single identifiable harm—disruption of the Southern Union—Southwest Gas merger. Nor does this *Campbell* guidepost foreclose a consideration of Commissioner Irvin's concomitant breach of the public trust by disrupting the merger. Certainly, Irvin's ignoble neglect of the public trust, that was inextricably related to his disruption of the merger may be considered by the Court on the issue of reprehensibility.

There is significant convincing evidence supporting the jury's decision to return a verdict assessing punitive damages and awarding the amount chosen. Elaborating on what was previously alluded to, Commissioner Irvin is vested with immense powers founded in the Constitution of the State of Arizona, and the people who elected him to this public office had faith that he would engage his authority fairly and in accordance with the law. The evidence shows and the jury found that he abused those powers in favor of the private interests of a specific utility company, ONEOK, and his personal interests, by intentionally and deceptively participating in dissuading the Southwest Gas Board from adopting a plan to merge with Southern Union. Apparently because of the wrongdoing, he concealed his activities from his fellow Commissioners and the public during such activities, and afterwards he covered up the wrongdoing to ensure the outcome of the scheme. Finally, he persevered in hiding his wrongful acts throughout the trial and in particular while testifying in Court before the jury.

A particularly egregious act of reprehensibility occurring during trial was the evidence that Irvin was involved in the attempted proffer of fabricated evidence, again demonstrating that he would persist in refusing to take responsibility for his behavior. On October 24, 2002, the week before trial began in the late evening, Irvin's counsel informed the Court that new evidence had been discovered and would be offered at trial. This evidence included two pages of notes written by Carol Irvin dated "7–31–99." The notes described a telephone conversation between Carol Irvin and Defendant Jack Rose allegedly occurring on July 31, 1999. Irvin's counsel represented that the notes were taken "contemporaneously" with the 1999 conversation. The content of the notes emphatically indicated that Rose, an assistant to Irvin at the time of the failed merger, told Carol Irvin that he was principally involved in working on the merger while "Jim [Irvin] not involved." The truncated notes continued, in part, to further exculpate Irvin with allegations of Rose's remarks that "Jim [Irvin] did nothing wrong—Jack working with others to bring Oneok to AZ. Jim not involved—trusted Jack to do research.... Jack did a lot without Jim knowing cuz Jim busy at Commiss. Jack working in AZ Best inter-

est. When will Jim be home—Jack needs to tell Jim s-o-o much he doesn't know! .... Call me anytime! I'm there for you! Don't worry—we did nothing wrong." Further, and not appearing to be merely coincidental, the notes were written on the back of unrelated documents dated March 30, 1998 and April 8, 1998.

Adding to the suspicion, Irvin's counsel said that Carol Irvin also gave counsel a statement of her recollection of a meeting between Commissioner Kunasek and Irvin also occurring in 1999. Significantly, the statement was represented to have been authored by her one week before trial. Conspicuously, this statement was not drafted on paper with the printed date of 1998. Further, the notes of her conversation with Rose were styled in short, chopped phrases as if hurriedly written. In contrast, the statement of her recollection of the 1999 meeting was written in complete sentences which logically flowed from one topic to the next and was not written with on paper with the printed 1998 on the back.

Irvin's counsel further represented that Carol Irvin had disclosed to him the existence of the notes and the statement the day before, October 23, and had provided them to him on October 24. After this revelation, the Court ordered Irvin's counsel to produce the notes and the statement for inspection by Plaintiff's and Rose's counsel. On October 31, 2002, in open Court and in the presence of Irvin and/or Irvin's counsel, Plaintiff's counsel requested an opportunity for Plaintiff's forensic examiner to examine the notes and the Court granted the request. The next day, on November 1, 2002, counsel for Irvin contacted the Court at approximately noon and requested an emergency hearing that was held in the afternoon of the same day. Irvin's counsel explained that a meeting with Carol Irvin and Commissioner Irvin occurred in the morning of that day and

new information came to light regarding whether the notes had been prepared contemporaneously during Carol Irvin's 1999 conversation with Rose. Counsel first stated that "there was considerable confusion on the communication on those notes." Tr. at 1286. He then retracted his position that the notes had been made "contemporaneously" with the 1999 Rose phone call, concluding that he learned the notes had actually been written the week before at the same time as the statement was written. Irvin's counsel apologized for the misunderstanding he had with Carol Irvin regarding whether the notes were "original" notes of the conversation with Rose. *Id.* at 1289. A subsequent hearing was held to determine whether the initial representation of the timing of the preparation of the notes by counsel for Irvin, and the retraction of such representation after Plaintiff announced that a forensic examiner would evaluate the notes, constituted sufficient evidence pursuant to Federal Rule of Evidence 104 for the jury to find that Commissioner Irvin and his wife jointly proffered fabricated evidence to the Court. Carol Irvin testified, in an attempt to explain the misunderstanding, that she did take contemporaneous notes of the 1999 conversation with Rose, kept them in a file, recopied them on October 23, 2002, but then destroyed the original. She did not offer a plausible explanation for destroying the original notes, and Irvin's counsel withdrew his proffer for admission of the notes in evidence.

Thereafter, Plaintiff sought to present the circumstances of the attempt by counsel on behalf of the Irvins to gain permission from the Court for admission of the notes into evidence. Southern Union argued that this conduct was relevant to proving that Irvin intentionally interfered with Southern Union's prospective business advantage and intentionally interfered with Southern Union's contractual

relations. The Court delayed ruling on the request, but over the course of trial sufficient evidence was admitted to allow the admission of the notes and the attendant circumstances regarding them. The Court granted Southern Union's motion. Central to the Court's decision were two factors: Carol Irvin testified that Irvin knew about the notes before she disclosed them to his counsel, and that the day after Southern Union announced in open court that a forensic examiner would evaluate the notes, on November 1, Irvin attended the meeting when a decision was made to withdraw the notes. Irvin testified that his wife "made mention" of her notes from 1999 on the night of October 23, and that he directed her to call his counsel that night to discuss various issues concerning the trial. *Id.* at 6084; Tr. 12/6/02 at 4789–90. On the morning of October 24, Commissioner Irvin transported the notes in an envelope from Carol Irvin's possession to the office of his counsel. Carol Irvin testified that she told her husband that the notes were of her conversation with Rose, though Commissioner Irvin testified that he could not recall if his wife told him what was in the package. Tr. 12/13/02, at 6070–1, 6073.

The Court again finds that the evidence was sufficient for the jury to find intentional fabrication of evidence and that it was admissible to show Irvin's consciousness of wrongdoing and was relevant regarding the intent of Irvin when engaging in activities related to the claims. The jury instructions clarified that "[e]vidence that defendant Irvin offered fabricated evidence to the Court that he believed would be favorable to his defense, are circumstances that, if proven, may be considered by the jury as showing consciousness of wrongdoing on the part of defendant Irvin." Instruction No. 20 [Doc. # 2196].

Both causes of action are intentional torts and both involve an element of "improper motive." The Complaint alleged significant deceit and concealment by Irvin. The attempted fabrication of evidence clearly shows the reprehensibility of Irvin's conduct. In short, he participated in a scheme to impede the jury's search for truth at trial. Because this conduct occurred three years after Irvin's wrongful conduct regarding the merger and because it constitutes a willful obstruction of justice, the jury could readily find that Irvin would continue to engage in improper conduct as a Commissioner. All of which strengthens the jury's concern that if Irvin was not deterred by an appropriate award of punitive damages, he would continue to engage in further reprehensible acts as an Arizona Corporation Commissioner.

Finally, Irvin's abuse of power included disregarding the interests of the rate-payers of Arizona, which is a centerpiece of his public duties as an Arizona Corporation Commissioner.[1] The jury's $60 million punitive damages award clearly evinces a condemnation of Irvin's conduct, a desire to punish him for the harm and potential

---

1. Gregory Patterson, who represented Arizona consumers as Director of the Residential Utility Consumer Office (RUCO) during the time of the merger, testified at trial. Mr. Patterson confirmed that RUCO represents Arizona residential consumers as a party in proceedings before the Commission, and had a clear stake in any change in ownership of Southwest Gas and how it affects "the quality of service, the viability of the company, the intention to raise rates." Tr. 5764, 5893. RUCO, representing consumers, may present its opinions and offer evidence, though it may not vote. Tr. 5890–94. Thus, the interests of Arizona consumers are clearly affected by the Commission's decisions and influence. Further, although Mr. Patterson advocated against the Southern Union merger before the Southwest Gas Board, he testified at trial that if he had known that he was basing his opinion on false information about Southern Union's debt-to-equity ratio, he would have given a different presentation to the Southwest Gas Board.

harm suffered by both Southern Union and the citizens of Arizona, and to deter Arizona public officials from further abuses such as meddling with multi-million dollar corporate transactions in derogation of their duties of affording fairness to all parties participating in Commission matters.

### (2) Ratio

In *Campbell,* the Supreme Court "decline[d] again to impose a bright-line ratio [between compensatory and punitive damages] which a punitive damages award cannot exceed." *Campbell,* — U.S. at ——, 123 S.Ct. at 1524. Apart from this, the Court remarked, "[o]ur jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell,* — U.S. at ——, 123 S.Ct. at 1524. In this case, the compensatory award against Irvin was $390,072.58, meaning that the ratio of punitive to compensatory damages is about 153 to 1. Commissioner Irvin argues that the punitive damages award should be overturned solely because this ratio is excessive.

The Supreme Court's holding on ratios, however, is not categorical. The opinion acknowledges that a "few awards" exceeding a single-digitratio "to a significant degree" will meet the constitutional mark. The Court does not explore the circumstances under which larger awards will be upheld, though it provides some direction. In *Campbell,* the Court stated, "because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages.'" *Id.* at 1524 (quoting *Gore,* 517 U.S. at 582, 116 S.Ct. 1589). In *Gore,* the Court, "reject[ing] the notion that the constitutional line is marked by a simple mathematical formula," surmised that "[a] higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.* at 582, 116 S.Ct. 1589.[2] Considering the Supreme Court has only recently begun sketching these due process limits in a few cases, it is not surprising that the Court has not considered how to quantify the damage caused by a breach of the public trust by a public official.

But the case law does not preclude but supports a significant award resting on the particularly reprehensible actions by a public official in violation of the public

---

**2.** The Supreme Court's recent pronouncements reflect a historical understanding that punitive damages serve to punish defendants where the harm is non-economic or difficult to quantify, such as in this case. In an early case upholding the recognition of the common law propriety of punitive damages, the Court noted, "[i]n many civil actions, such as libel, slander, seduction, & c., the wrong done to the plaintiff is incapable of being measured by a money standard; and the damages assessed depend on the circumstances, showing the degree of moral turpitude or atrocity of the defendant's conduct, and may properly be termed exemplary or vindictive rather than compensatory." *Day v. Woodworth,* 54 U.S.

363, 371, 13 How. 363, 14 L.Ed. 181 (1851). The Court was compelled to deny Southern Union's demand for damages incurred as a consequence of the failed merger because they were legally incapable of measurement. This ruling is not to be interpreted as a finding that Southern Union did not sustain such damages. It meant only that the damages were "incapable of being measured by a money standard, and the [amount] assessed depend[ed] on the circumstances" that necessarily involved an elusive prediction of the degree of monetary success that would have followed a Southern Union—Southwest Gas merger.

trust. Because the injury caused by a public official's violation of the public trust is uniquely dependent on the variables of each public office, significant consideration in each case must be given to the nature of the public trust embodied in the position held by the official, e.g., the President of the United States in comparison to a precinct committee chairman. Consequently, application of the numerical ratio is most often unfit for the imprecise and limitless characterizations of the public trust. Further, punitive damages against public officials occupy a unique role in the jurisprudence of punitive damages, and have been assessed against public officials for oppressive conduct regardless of actual or compensatory damages. Concomitantly, the law allows punitive damage awards in § 1981 and § 1983 cases against public officials, even when a jury awards only nominal damages. Finally, the Supreme Court allows consideration of unquantifiable potential harm in assessing the ratio in these cases.

Initially, punitive damages against public officials for violations of the public trust are firmly grounded in the law, and the evidence suggest that punitive damages, as a historical matter, were developed *specifically* as a method to punish public corruption. According to the Restatement (Second) of Torts § 908, comment c, "[i]n the earliest cases in which punitive damages were allowed, the plaintiffs suffered no substantial harm, or at least no physical or financial harm appeared. These were the cases in which public officials were guilty of outrageously oppressive conduct." As some commentators have documented, early English "[c]ourts imposed these first exemplary damage awards against public officials who abused power in their official capacity, but the remedy soon took on a wider role." Michael L. Rustad & Thomas H. Koenig, *Taming the Tort Monster; The American Civil Justice System as a Battleground of Social Theory,* 68 Brook. L.Rev. 1, 57 (2002).[3] *See also Lane County v. Wood,* 298 Or. 191, 200, 691 P.2d 473, 477 (Or.1984) ("Historically, oppressive conduct by public officers was the situation where early judges were most prone to sanction exemplary damages, and by which they justified and rationalized the doctrine.") (quoting McCormick, *Damages* 288, § 81 (1935)).

Because of this history, and the unique harm inflicted by a breach of the public trust, punitive damage awards assessed against public officials have in some cases required less of a proportional connection to actual monetary damages to be upheld. In *Lane County v. Wood,* 298 Or. 191, 691 P.2d 473 (Or.1984), the Supreme Court of Oregon thoroughly explored the history of punitive damages as related to public officials, and concluded that an award of *nominal* damages could support an award of punitive damages against a public official where the public official committed a breach of the public trust. Subsequent Oregon cases have clarified that this principle is limited to awards against public officials; in almost all cases, some amount of compensatory damages is necessary for an award of punitive damages. *See Klinicki v. Lundgren,* 298 Or. 662, 686, 695 P.2d 906, 922 (Or.1985) ("[A]bsent breach of public trust or cases in which damages are presumed, punitive damages cannot be

**3.** Professors Rustad and Koenig explore the history of English and early American punitive damages in some detail, noting, for example, that "[j]ust as Roman Senators were assessed multiple damages when they oppressed the weak, the English courts punished high-handed aristocrats by imposing large fines paid directly to the victim." *Id.* at 55. Notably, the Court has often relied on this history in discerning Constitutional limits on punitive damages. *See Gore,* 517 U.S. at 580–581, 116 S.Ct. 1589 (analyzing early English statutes on exemplary damages).

awarded merely to punish.... In other words, a proven discrete, discernable harm must underlie any punitive damages award.").

In *Lane County*, the plaintiff county sued a former county commissioner for fraud, breach of fiduciary duty, and breach of statutory duty for actions taken when the commissioner was still in office. In striking similarity to this case, a commissioner rigged a land deal to benefit two of his friends by manipulating his position as commissioner. The jury returned a verdict of $1.00 in nominal damages but $5000 in punitives against the commissioner. The Oregon Court, after extensively reviewing the history, the Restatement, and leading authorities, concluded that the commissioner's actions, in breach of his fiduciary duty to the public, were "so egregiously culpable that an award of nominal damages is sufficient to support the award[ ] of punitive damages against [him]." 691 P.2d at 479.[4]

*Lane County* indicates that a violation of the public trust is itself a considerable, cognizable harm, though one without a definitive monetary value. Here, Irvin abused the public trust by misappropriating his elected authority to undermine fair consideration of Southern Union's offer. Southern Union suffered from Irvin's failure to afford it a fair and unbiased investigation and consideration of its proposal for a merger. Apart from this injury, the public suffered by virtue of Irvin's bold defiance of the law that defined his duties and responsibilities. Accordingly, Irvin's argument that he, as a public official, should not be subject to different potential punitive damage standards as other defendants verges on being frivolous. The ratio of compensatory to punitive damages is not justified merely because Irvin is a public official, but because his conduct caused a harm to the public trust that is not discernable merely by an award of compensatory damages. *Cf. Davis v. McLaughlin,* 1989 WL 47699, *2 (E.D.N.Y. April 28, 1989) ("While it is true that a comparison of the two numbers might be a provident exercise in many cases, their ratio is of dubious value where, as here, intangible rights have been vindicated by plaintiff's successful claim.").

The decisions which allow the assessment of punitive damages in § 1983 suits filed against public officials, even when damages are only nominal (which almost always produces a ratio far in excess of 10:1), demonstrate a recognition in the law of the vital importance of preserving the public's trust in those who are chosen to govern, and to exercise their precious and sometimes almost limitless powers to effect changes and alter consequences effecting the lives of the very people who empowered the official. Following *Gore,* the

---

4. An analogous case which the Oregon court appears not have considered is *Wilson v. Vaughn,* 23 F. 229 (C.C.D.Kan.1885). In that case, the Court held that exemplary damages could be awarded against public officials even where only nominal damages were found. The plaintiff sued county commissioners to recover damages for their wilful refusal to levy a tax on property pursuant to a valid judgment and writ of mandamus. The plaintiff suffered only delay of collecting the judgment, and thus only nominal damages. However, the Court upheld an award of exemplary damages, noting, "the plaintiff is deprived of a clear legal right through the wrongful and wilful conduct of the defendants. They alone have the power to levy the tax, and it is their duty, under the law and the command of the court, to levy it.... [P]laintiff's compensatory damages are but nominal ... but it is in the power of these defendants and their successors in office, by defying the law, to delay him indefinitely in its collection." *Id.* at 231–2. Thus, the Oregon court had at least one century-old pedigree to support its holding. *See also EEOC v. Wal–Mart Stores, Inc.,* 11 F.Supp.2d 1313, 1326 (D.N.M.1998) (relying on *Wilson* for the proposition that "exemplary damages may be awarded where only nominal damages are established").

Second Circuit has upheld an award of punitive damages in a case where only nominal damages were awarded against a public officer. In *Lee v. Edwards,* 101 F.3d 805 (2d Cir.1996), the Court upheld a punitive damages award of $200,000 in a case where plaintiff prevailed on a malicious prosecution claim. The Court noted, "the jury was obviously unimpressed by Lee's claim to have suffered harm by reason of being prosecuted maliciously," however, "[a]s a police officer, Edwards exercised an authority backed by the weight and force of state power," which could allow the jury to find the officer's conduct "egregious and reprehensible." *Id.* at 810. The Court noted that *Gore*'s disapproval of a 500:1 compensatory to punitives ratio "does not necessarily control the fair ratios in a § 1983 case. We have said that punitive damages may be awarded in a § 1983 case, even if the compensatory damages are only nominal." *Id.* at 811 (citing *King v. Macri,* 993 F.2d 294, 297–98 (2d Cir. 1993)). In short, "in a § 1983 case in which the compensatory damages are nominal, a much higher ratio can be contemplated while retaining normal respiration." *Id.*

Indeed, a number of courts have held that an award of nominal damages (or sufficient proof of injury) can support an award of punitive damages under § 1981 and § 1983, situations which *in particular* involve wrongdoing by a *public officer.* *See Gill v. Manuel,* 488 F.2d 799, 802 (9th Cir.1973) (in case where plaintiff sued police officers under § 1983, noting that "an award of punitive damages is not a necessary prerequisite to an award of punitive damages."); *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1352 (7th Cir.1995) (holding that award of compensatory damages is not necessary to support award of punitive damages under § 1981); *Timm v. Progressive Steel Treating, Inc.,* 137 F.3d 1008, 1010 (7th Cir. 1998) (holding, post-*Gore,* no requirement

of compensatory damages to support punitive damage award in Title VII sex discrimination suit) (citing *Erwin v. Manitowoc County,* 872 F.2d 1292, 1299 (7th Cir. 1989) (holding no requirement of compensatory damages to award punitive damages for constitutional damages under § 1983)); *King v. Macri,* 993 F.2d 294, 297–8 (2d Cir.1993) (punitive damage award need not be based on compensatory award in § 1983 actions) (citing *Press Pub. Co. v. Monroe,* 73 F. 196, 201 (2d Cir.1896) (holding, in action for violation of copyright, "exemplary damages are awarded in the federal courts, namely, as something additional to, and in no wise dependent upon, the actual pecuniary loss of the plaintiff, being frequently given in actions 'where the wrong done to the plaintiff is incapable of being measured by a money standard.'") (quoting *Day,* 54 U.S. at 371, 54 U.S. 363)). *See also Deters v. Equifax Credit Information Serv.,* 202 F.3d 1262 (10th Cir.2000) (upholding 59:1 punitive to compensatory ratio in Title VII case with small compensatory damage award where injury was primarily non-economic).

Further, although the Supreme Court has not addressed this issue in its recent punitive damages decisions, it has emphasized the importance of punitive damages assessments against public officials. In the context of § 1983 suits against public officials for violations of constitutional rights, the Supreme Court has noted:

By allowing juries and courts to assess punitive damages in appropriate circumstances against the offending official, based on his personal financial resources, the statute directly advances the public's interest in repeated constitutional deprivations. In our view, this provides sufficient protection against the prospect that a public official may commit recurrent constitutional violations by reason of his office. The Court previously has found, with respect to such

violations, that a damages remedy recoverable against individuals is more effective as a deterrent than the threat of damages against a government employer. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 269, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (citing *Carlson v. Green*, 446 U.S. 14, 21, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)). Public official punitive damage awards advance the public interest. by deterring a reappearance of official misconduct. If awards were restricted to adhere to a formula for calculating the punitive harm, the goal of deterrence, in some case, will be lost.

The Court realizes, of course, that the this case was not brought as a civil rights action. However, the same reasoning supports a punitive award to punish and deter the abuse of power by public officials in these cases. First, the conduct here bears the hallmarks of a civil rights action, including an official acting under color of state law, intentional misconduct, and biased and differential treatment of parties before the Commission in ways that undermine due process and equal protection of the laws. Although Southern Union, as a corporation, may not be able to bring a § 1983 suit, such due process violations affect the public as a whole. Corporation commissioners possess wide powers to "inspect and investigate the property, books, papers, business, methods, and affairs of any corporation whose stock shall be offered for sale to the public and of any public service corporation doing business within the state, and for the purpose of the commission, and of the several members thereof, shall have the *power of a court of general jurisdiction* to enforce the attendance of witness and production of evidence by subpoena, attachment, and punishment, which said power shall extend throughout the state." Jury Instruction No. 15 [Doc. # 2196] (emphasis added). As the Arizona Supreme Court has noted,

When an Arizona administrative agency unreasonably infringes on the liberties of a corporation, its officers, and its shareholders, it is the Arizona courts who must be able to curb the abuse of power. The Corporation Commission has been treated as a fourth branch of government in Arizona.... [I]f an administrative agency's investigation becomes a tool of harassment and intimidation rather than a means to gather appropriate information, the appropriate court may intrude and stop the incursion into the constitutional liberties of the parties under investigation.... The Commission is empowered to investigate for purposes of enforcing the securities laws; the Commission has no authority to determine on a basis other than compliance with the securities laws those persons or corporations who may conduct business in Arizona. The Commission may not constitutionally use its investigatory powers to harass, intimidate, and defame a business into leaving the state.

*Polaris International Metals Corp. v. Arizona Corporation Commission*, 133 Ariz. 500, 506–7, 652 P.2d 1023, 1029–30 (1982). The record is replete with evidence of bias and a failure to provide due process and impartial consideration of Southern Union's offer.

Second, the civil rights cases reflect a broader goal of deterring abuses of the public trust by public officials that is not limited to individual constitutional rights violations. As the Second Circuit noted in *Zarcone v. Perry*, 572 F.2d 52, 56–7 (2d Cir.1978), in a decision upholding punitive damages against public officials for constitutional violations, "it is clear that substantial exemplary damage verdicts are appropriate in intentional tort actions not involving constitutional deprivations." *See also Lane County*, 691 P.2d at 479 ("It may be that the property involved appreci-

ated in value so that no actual loss was sustained by the county, but that fortuitous result does not diminish the severity of the wrongful acts.... The misconduct by [the defendants] was intentional, not just careless. The scheme was premeditated, not reckless. The two defendant, motivated by greed, were found by the jury to have acted together knowingly to violate an official trust place on Wood by the public.").

Moreover, the Supreme Court has not limited the ratio calculation to actual compensatory damages, and has suggested that comparisons to *potential* harm are appropriate. In *TXO*, the Court upheld a punitive damages award where the ratio of punitive to compensatory damages was about 526:1, relying in part on the potential for damages caused by the defendant's conduct. The plurality noted that "this Court [has] eschewed an approach that concentrates entirely on the relationship between punitive and actual damages. It is appropriate to consider the magnitude of the *potential harm* that the defendant would have caused to its intended victim if the wrongful plan had succeeded...." *TXO*, 509 U.S. at 459, 113 S.Ct. 2711 (plurality opinion) (italics in original). The use of potential harm in assessing the ratio continues throughout the Court's most recent decisions, but neither *Gore* nor *Campbell* involved an issue of potential harm

because the issue was not relevant in those cases. *See Gore*, 517 U.S. at 575, 116 S.Ct. 1589 (describing second guidepost as "the disparity between the harm or potential harm ... and [the] punitive damages award"); *id.* at 581, 116 S.Ct. 1589 (relying on the plurality's "potential harm" holding in *TXO* to discern lower ratio in that case); *Campbell*, —— U.S. at ——, 123 S.Ct. at 1520 (describing second guidepost in terms of "actual or potential harm").[5]

Again, though the Court held that Southern Union was not entitled to recover damages for speculative lost profits, the potential for such damage could be factored into the jury's decision to punish Irvin. For example, another district court in the Ninth Circuit recently upheld a punitive damages award of $5,000,000 in a § 1981 racial discrimination case against a private corporation even though the jury found only nominal damages. *See Bains LLC v. Arco Products Co.*, 220 F.Supp.2d 1193, 1201 (W.D.Wash.2002). As the Court noted, "[t]he jury's award of nominal damages and high punitive damages is reflective of its findings that while compensatory damages were difficult to calculate, the egregiousness of Defendant's conduct was obvious to everyone in the courtroom." *Id.* at 1201. *See also Swinton v. Potomac Corp.*, 270 F.3d 794, 819 (9th Cir.2001) (in upholding a 28:1 punitive to compensatory damage ratio in private racial harassment

---

**5.** Notably, in this case, the ratio is dramatic primarily because the Court previously found Southern Union's lost profit calculations to be too speculative to support recovery for lost profits, and limited Southern Union to recovery of only out-of-pocket reliance damages. *See Southern Union Co. v. Southwest Gas Corp.*, 180 F.Supp.2d 1021, 1051 (D.Ariz. 2002) ("The indeterminacy concerning this basic merger term illustrates that Southern Union's claim for lost profit damages is too speculative to support recovery."). To the extent that due process limits the size of a punitive damage award because the defendant is not on notice of his potential liability,

Irvin's undisputed experience and knowledge made him aware of the potential enormous risks of his conduct would have in disrupting a multi-million dollar transaction. *See Campbell*, —— U.S. at ——, 123 S.Ct. at 1525 (quoting *Gore*, 517 U.S. at 585, 116 S.Ct. 1589 (Breyer, J., concurring)) (discussing fair notice requirements); *Gore*, 517 U.S. at 574, 116 S.Ct. 1589 ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice ... of the severity of a penalty that a State may impose."). See also the discussion of Southern Union's damages *supra* at 9, n. 2.

claim, noting "[t]he fact that the harm from unchecked racial harassment occurring day after day cannot be calculated with any precision does not deflate its magnitude").

In short, in consideration of the unquantifiable breach of the public trust by Irvin and the significant potential damages faced by Southern Union, reliance upon the ratio of punitive to compensatory damages is unwarranted. In a case of such egregiousness, the benchmark of a simple numerical ratio, where the Supreme Court has repeatedly clarified that it has not established a bright-line categorical rule, does not defeat the award because it violates due process. *Cf. Swinton*, 270 F.3d at 819 ("We find little comfort in trying to discern [ratio] parameters from other cases because the circumstances vary so widely. Such an exercise simply results in a scatter graph that pushes the decision toward a mathematical bright-line, a path that we eschew in accord with the Supreme Court guidelines."). Under the second *Campbell* guidepost, the award is not constitutionally excessive.

### (3) Penalties imposed in comparable cases

■ The third guidepost is a comparison of the punitive damages award with civil or criminal penalties for comparable misconduct. *Campbell*, —— U.S. at ——, 123 S.Ct. at 1526. The exact method of application of this criterion in unclear in *Gore* or *Campbell*. In *Campbell*, the Court rejected comparable civil and criminal penalties as a justification for the size of the award, noting that "[t]he existence of a criminal penalty does have bearing on the seriousness with which the State views a wrongful action. When used to determine the dollar amount of the award, however, the criminal penalty has less utility." *Id.* at 1526. Further, the Court noted that the most relevant civil sanction involved a maximum fine of $10,000. *Id.* In *Gore*, 517

U.S. at 583–5, 116 S.Ct. 1589, the Court also noted that the defendant's actions were subject to a much smaller civil fine than the award of punitive damages.

Irvin argues that this punitive damages award should be struck down because it far exceeds any comparable or civil penalty, and also exceeds any punitive damages award upheld in Arizona. Irvin relies on *Ace v. Aetna Life Ins. Co.*, 139 F.3d 1241, 1248–9 (9th Cir.1998), in which the Ninth Circuit, without extensive comment, invalidated a $16.5 million punitive damages award with a 130–to–1 punitive-to-compensatory damages ration where "the ratio . . . is far beyond any approved by Alaska courts. . . . [and] the amount of punitive damages far exceeds the potential civil and criminal penalties." Southern Union argues that the award does not exceed awards upheld in a few other (out-of-state) cases, and thus Irvin was on notice of the prospect of sufficiently large penalties. *See, e.g., TXO*, 509 U.S. at 459, 113 S.Ct. 2711 (1993) (upholding 526 to 1 punitive to compensatory damage ratio); *In re Exxon Valdez*, 236 F.Supp.2d 1043 (D.Alaska 2002) (upholding $4 billion of punitive damages award in case involving economic (not environmental) damage of oil spill). As for state civil penalties, Southern Union essentially concedes that none would mandate any comparable monetary award unless Irvin was ordered to pay restitution for lost profits. However, under Arizona law, even if Irvin were required to pay restitution as part of a criminal conviction, the sum would not include compensatory damages such as lost profits. A.R.S. § 13–105(14); 13–804(A). On the other hand, Irvin's conduct almost certainly could be framed as mail and wire fraud under federal law, and, if proven, he would be subject to a fine "not more than the greater of . . . twice the gross [pecuniary] loss" to Southern Union. 18 U.S.C. § 3571(d).

Unfortunately, the cases cited by the parties do not involve circumstances analogous to Irvin's misconduct in this case. Such comparisons provide no meaningful guidance for the Court to determine whether the award is unconstitutionally excessive. As the Supreme Court has noted, "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Campbell,* —— U.S. at ——, 123 S.Ct. at 1521 (quoting *Gore,* 517 U.S. at 575, 116 S.Ct. 1589). Here, the degree of reprehensibility is established by the breach of the public trust, and the parties provide no case law concerning punitive damage awards against Arizona public officials. As previously discussed, awards against public officials for breach of the public trust occupy a unique status in the imposition of punitive damages. *See Lane County,* 691 P.2d at 479. Again, it is difficult "to discern parameters from other cases because the circumstances vary so widely." *Swinton,* 270 F.3d at 819. Finding some concrete numerical limit to this award grounded in the Constitution is "not an enviable task" and not amenable to ready application of a formula. *Leatherman Tool Group, Inc. v. Cooper Industries, Inc.,* 285 F.3d 1146, 1152 (9th Cir. 2002) (quoting *Inter Medical Supplies v. EBI Medical Systems,* 181 F.3d 446, 468 (3rd Cir.1999)). Under the *Campbell* and *Gore* guideposts, in consideration of Irvin's egregious conduct flaunting the public trust, the award is not constitutionally excessive, and the Court need not hypothesize some outer limit to the punitive damages allowable in this case.

## C. Additional findings

The Court notes that Commissioner Irvin should be personally liable for payment of the punitive damages award. For example, under the Bankruptcy Code, 11 U.S.C. § 523(a)(6), a debt is not dischargeable in bankruptcy proceedings when it is incurred "for willful and malicious injury by the debtor to another entity or to the property of another entity." Commissioner Irvin, as clearly shown by the jury's verdict, engaged in fraudulent activity constituting tortious conduct resulting in a willful and malicious injury to Southern Union. *See In re Jercich,* 238 F.3d 1202, 1205–6 (9th Cir.2001) (tortious conduct causing willful and malicious injury is not dischargeable under § 523(a)(6)); *In re Riso,* 978 F.2d 1151, 1154 (9th Cir.1992) (same). Further, a public employee is only immune from liability for punitive damage awards if acting within the scope of his employment. A.R.S. § 12–820.04. Though that issue was never presented to the jury for resolution, the record in this case strongly suggests that he was not.

In conclusion, the reasoned judgment of the jury that Commissioner Irvin should be punished in an amount of $60 million will stand.

Accordingly,

**IT IS ORDERED** that Defendant Irvin's Amended Motion for JNOV or in the Alternative for New Trial or Remittitur [Doc. # 2238] is **DENIED.**